MARIETTA E. COLEMAN, Appellee, *vs.* JAMES E. MARSHALL, *et al.* Appellants.

*Opinion filed April 23, 1914.*

1. WILLS—*opinions as to testamentary capacity are admissible.* Upon a bill to set aside a will, and the probate thereof, on the ground of want of testamentary capacity, it is competent to ask the opinions of non-expert witnesses who knew and had opportunity for observing the mental condition of the testator, as to his soundness or unsoundness of mind at or about the time of the execution of the will, after the witnesses have stated facts upon which their opinions are based, but the weight to be given such opinions depends upon the facts stated from which the opinions are formed.

2. SAME—*what are proper questions to determine testamentary capacity.* In determining testamentary capacity the real question is whether, at the time the will was made, the testator had sufficient mind and memory to remember who were the natural objects of his bounty, to recall to mind his property and to make disposition of it understandingly, according to some plan formed in his mind, and while ability to transact ordinary business is an element for consideration in determining the mental capacity to make a valid will, it is not the true test.

3. SAME—*what are improper questions.* It is improper to ask witnesses whether the testatrix had sufficient mind and memory to understand and comprehend the particular thing in which she might be engaged; nor should the witnesses be asked whether the testatrix was capable of making a will and understanding and comprehending it, as that would be calling for the conclusion of the witness as to the testamentary capacity and would be an invasion of the province of the jury.

APPEAL from the Circuit Court of Marion county; the Hon. JAMES C. McBRIDE, Judge, presiding.

BUNDY & WHAM, for appellants.

KAGY & VANDERVORT, and L. B. SKIPPER, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

Appellee filed her bill in the circuit court of Marion county to contest and set aside the will, and the probate thereof, of Harriet Marshall, deceased. A trial was had and the jury found the proposed will was not the will of Harriet Marshall. The court overruled a motion for a new trial and entered a decree in accordance with the verdict of the jury.

Complaint is made of the admission of the testimony of appellee and of Mrs. Schumaker on behalf of the contestant, and of certain remarks made by appellee's counsel in their argument to the jury. The testimony of appellee and Mrs. Schumaker was incompetent and was stricken out by the court. It will not be admitted on another trial, and as the decree must be reversed on other grounds it will be unnecessary to determine whether the effect of the incompetent testimony was cured by the ruling of the court in striking it out. The remarks of counsel complained of are not likely to occur again, and it will be unnecessary to pass upon that complaint.

There was no proof whatever to support the allegations of the bill that the will was procured by undue influence.

Harriet Marshall had been a widow about two years when she executed the instrument alleged to be her will. The will was executed in April, 1892. At that time testatrix was seventy-one years old and had four sons, James E., W. Scott, Charles P. and Xenophon S. Marshall. These were her only children. Appellee is her grand-daughter, the only surviving child of a deceased child of testatrix. By her will she gave her whole estate and property to her four sons, but the will provided that in case of the death of Xenophon S. Marshall without issue, before the testatrix's death, all her property should go to the other three sons, and in case of the death of either of them before testatrix's death the share the parent would have taken under the will was to go to his children. The testatrix stated in her will it was not for want of love and affection for appellee that she did not give her a share of her estate, but because she was satisfied appellee was already provided for beyond her probable reasonable requirements, and the knowledge that in case misfortune should overtake appellee testatrix's surviving sons would see that she was provided for. Testatrix died December 1, 1910, between seventeen and eighteen years after the will was executed. Her son Xenophon was a consumptive and died before her death. After her death the will was admitted to probate and the three surviving sons qualified as executors, whereupon appellee filed her bill to contest the will and set aside the probate thereof, alleging Harriet Marshall's mind and memory were so impaired at the time she made her will as to render her incapable of executing a will, and also alleging she was induced to make the will by undue influence. By agreement of the parties the only interrogatory submitted to the jury was whether the writing purporting to be the last will and testament of Harriet Marshall was her last will and testament. By their verdict the jury found it was not.

One of the witnesses to the will died before the death of Harriet Marshall and the other witness to the will was

not called to testify at the trial. On the hearing appellants offered the original will and the certificate of the oath of the surviving subscribing witness on the probate of the will, in which oath he stated that he and Will J. Blythe, the other witness, were present and saw Harriet Marshall sign and seal the instrument of writing as and for her last will and testament, and that at her request and in her presence, and in the presence of each other, he and the other witness subscribed their names thereto as attesting witnesses, and that he believed the testatrix was of sound mind and memory and under no constraint when she signed the will. On the application for probate of the will proof of the signature of the deceased witness and that it was in his handwriting was made in the manner required by the statute. In addition to this proof appellants introduced the testimony of twenty witnesses who testified as to the mental capacity of Harriet Marshall.

Dr. W. A. Stoker, a physician of twenty-eight years' experience, and who had been superintendent of the insane asylum at Anna, Illinois, and of an asylum at Evansville, Indiana, and who had been engaged in the general practice of medicine in Centralia, where Mrs. Marshall lived before and at the time she executed the will, testified he had known her for about forty years before her death. Sometimes he would see her every week and at other times he would not see her for a number of weeks. He saw her at her own home, at his father's home, on the street, at church and various other places. He saw her in 1892 a few times at her own home and at his father's house. He conversed with her and heard her converse with others, and testified that from his observation of her he believed she was of sound mind in the spring of 1892.

O. V. Parkinson testified he had lived in Centralia about fifty years and from 1885 to 1898 was in the retail dry goods business there. He was raised within two or three blocks of the Marshall home and knew Mrs. Marshall un-

til she moved to Chicago. During the year 1892 he saw her a number of times. She would come to the store to make purchases and he would wait on her. She was not a frequent customer but came to the store occasionally and bought family supplies. The witness waited on her at numerous times and considered her of sound mind; never thought of her as being anything else.

E. A. Hartman was a partner of the witness Parkinson in the retail dry goods business and knew Mrs. Marshall many years. He was an intimate friend of her son Ed and had been in their home. He had seen Mrs. Marshall in the store at different times and waited upon her, and often saw her on the street. He testified she was a reserved woman, attended to her own business and always seemed to know what she was buying. His dealings with her extended over the year 1892. He considered her of sound mind.

Mrs. Lida Page lived in Centralia from 1867 or 1868 to 1892, when she moved to Chicago. She became acquainted with Mrs. Marshall shortly after she went to Centralia to live. The witness and Mrs. Marshall were very friendly, exchanged calls, and their intimacy continued up to the time witness left Centralia, in 1892. Mrs. Marshall had visited at the witness' house with her husband during his lifetime. Witness frequently saw her on the street, in stores and at other places. The last time she saw her was in the fall of the year. In her opinion Mrs. Marshall was of sound mind.

Fred Pullen, mayor of the city of Centralia, testified he had known Mrs. Marshall all his life but had known her best during the years 1902 and 1903 and subsequently. Charles P. Marshall married the witness' sister and Mrs. Marshall lived with her son some years, during which time witness frequently saw and conversed with her and heard her converse with others. He testified he thought she was one of the brightest old women he ever knew, and in his opinion she was, in the year 1892, of sound mind.

Mrs. E. S. Condit resided in Centralia a great many years and became acquainted with Mrs. Marshall in 1891 but had seen her a great many times before becoming acquainted with her. The witness' sister married Charles P. Marshall, and the witness' brother and Ed Marshall were intimate friends. She testified her sister married Charles Marshall in 1891, and after that time she knew Harriet Marshall very well. After witness' sister and Charles Marshall were married Harriet Marshall lived with them for a while, and the witness testified she saw Mrs. Marshall under all circumstances and at all hours of the day and conversed with her. She testified Mrs. Marshall was quite a home body, spent her time in knitting and in piecing quilts and quilting, and in things of that kind. She did not do housework. Her health was good. Witness never knew her to be sick, and while she did not go down town often, she would go by herself and return as she chose. The witness testified Mrs. Marshall's mind was sound.

Mrs. George Doe testified that she had lived in Centralia more than twenty years and knew Mrs. Marshall. About the year 1894 Mrs. Marshall lived with her son, who was next door neighbor to the witness. Mrs. Marshall's husband was a physician and in his lifetime was the physician of the witness' husband. She often saw and talked with Mrs. Marshall, and while she lived with her son next door to witness she saw her every day and sometimes three or four times a day. The witness thought her an exceptionally bright old lady and that her mind was sound.

Margaret Stoker testified she lived in Centralia from 1867 to August, 1892, and was a sister-in-law to two of Mrs. Marshall's sons. She knew Mrs. Marshall quite well in Centralia and in Evanston, where they both lived at the time of Mrs. Marshall's death and for some time previously. While they lived in Centralia witness was in Mrs. Marshall's house a number of times when there was sickness or death in the family. She had also seen Mrs. Marshall at

church, and after they moved to Evanston frequently saw her and a number of times ate at the table with her. The witness testified she was sure Mrs. Marshall was of perfectly sound mind.

Zella Marshall, a daughter of James E. Marshall, testified she moved from Centralia to Chicago in 1900. She had always lived in Centralia before that time. She was a frequent visitor at her grandmother's house. Xenophon Marshall died at his mother's house in 1893, unmarried. Appellee and her brother, Edward Goodner, and her sister, Zolla, lived with Mrs. Marshall several years. Appellee's brother and sister died, and the appellee continued to live with Mrs. Marshall until or about the time of her marriage. Some time after 1894 Mrs. Marshall left Centralia and went to live with her sons. We are unable to determine from the abstract just when she left Centralia or began living with her children, but the witness testified her grandmother lived with witness' father, James E. Marshall, in Evanston, seven years prior to her death. She was in good health until a week before she died, and was interested in her grandchildren, in building, in things that went on in the neighborhood, and in current events. She read magazines, daily papers and the Bible, took care of her own room, mended her clothes, and did all the ordinary things that a woman would do about her room and personal affairs. Witness' sister was married at her father's house in August, 1905. Her grandmother was there, conversed with the guests and enjoyed the wedding supper with them. The witness testified her grandmother was unusually bright and intelligent for a woman of her age and was of sound mind.

Dr. Edward G. Semple testified he became acquainted with Mrs. Marshall in 1895 at the home of her son W. Scott Marshall, where she resided. At that time the witness was not a physician. He was licensed to practice in 1904. He saw Mrs. Marshall about once a week for three or four months following his first acquaintance with her and then

did not see her again until 1901 or 1902. From that time until 1903 or 1904 he saw her when visiting at her son's house, once or twice a week. He conversed with her and heard her converse with others, and never noticed any indication of unsoundness of mind and believed her to be of sound mind. He never treated her professionally.

Ten other witnesses testified on behalf of appellants to their acquaintance with and knowledge of Mrs. Marshall, covering the year 1892 and prior and subsequent years. None of them testified to having business transactions with her, but all or most of them had frequent opportunity to converse with her and hear her converse with others and to observe her conduct and manner. They testified that in their opinion she was of sound mind.

Seventeen witnesses were called and testified on behalf of appellee. John Marshall, a nephew of Mrs. Marshall's deceased husband, lived with his wife on his uncle's farm, about one-half mile from his uncle's home, five or six years. He left there and went to live in Nebraska and later to Colorado, where he now resides. He had not seen Mrs. Marshall since August, 1881. Before that time he knew her quite well and for a short time lived in the same house with her and her husband. When they lived in separate houses they visited back and forth frequently. He testified Mrs. Marshall was exceedingly nervous and suffered from some physical ailment, the nature of which he did not know. He never knew her to write a letter or sign an instrument or document of any kind, and the letters he and his wife received after leaving Illinois were written by Mrs. Marshall's grandchildren. He testified she would have outbursts of temper and a great deal of the time acted unpleasantly and irrationally. On one occasion she beat one of her children with a clenched fist. She never visited with anyone outside her own family except an old lady who came to see her once or twice, and she may have visited the old lady once or twice. He never knew her to transact any

263 — 22

.business by herself. She did not purchase or order provisions for the family. This was done by her husband and the boys. The witness was unable to state whether Mrs. Marshall was physically and mentally able to sign her own business papers and understand them. He did not remember ever seeing her write anything,—either a letter or document of any other character. She was morose and not neighborly or friendly with her neighbors. The witness was asked if in his opinion, during the time he knew Mrs. Marshall, she was of sound and disposing mind and memory, and answered that in his opinion she was not.

Rhoda J. Marshall, wife of John Marshall, testified to her acquaintance, knowledge of and association with Mrs. Marshall until August, 1881, and her opportunities for observing and knowing her mental and physical condition. She testified Mrs. Marshall had some physical ailment and her recollection was it was some female trouble. She was exceedingly nervous, moody, high-tempered and lacked self-control. The witness never knew her to write letters or documents, and all the letters she received from her after leaving Illinois were written by Mrs. Marshall's granddaughters. At times she would not pay any attention to her husband or anyone else around her, and later would complain that the same persons were not sociable with her. The household provisions were purchased by her husband and sons. She never saw Mrs. Marshall transact any business affairs. All the business of the family was transacted by the husband and sons. She was not neighborly with the neighbors and never visited anyone except a member of her own family. The witness testified she did not think Mrs. Marshall was physically or mentally able to sign her name to papers or business documents or to understand them. She was high-tempered and had violent outbursts at times. In answer to a question whether in her opinion Mrs. Marshall was of sound and disposing mind and memory, the witness answered it was her opinion she was not.

Fourteen other witnesses besides appellee were called and testified in her behalf. None of them were directly asked or directly testified that Harriet Marshall was of unsound mind and memory. Six of them testified to an acquaintance with her, but their knowledge of her and opportunities for observing her obviously were not such as to enable them to give an opinion that would be of any value upon the question of her mental capacity and they were not asked to express any opinion. One other witness was asked whether, from his acquaintance with, knowledge and observation of the testatrix for the years he had known her, he believed she was mentally capable of transacting ordinary business, and answered that he could not say that she was not capable but would say that she did not transact ordinary business. Some of the other witnesses, after stating their acquaintance with the testatrix, their associations with and knowledge of her and their opportunities for observing her actions and condition, were asked if in their opinion she was mentally capable of transacting business or ordinary business, and answered that in their opinion she was not capable. Others were asked the same question, and in addition thereto whether the testatrix had sufficient mind and memory to understand and comprehend the particular thing in which she might be engaged, and answered that in their opinion she had not.

None of the witnesses for appellee except the two Marshalls, who testified by deposition, expressed any opinion as to the unsoundness of mind of the testatrix, unless we are to infer the testimony of the witnesses who testified she was incapable of transacting business and of those who testified she had not sufficient mind and memory to understand and comprehend the particular thing in which she might be engaged was the equivalent of an opinion that she was not of sound mind and memory. We do not think the proper test of testamentary capacity was adopted by the questions asked the witnesses on the part of appellee. It is compe-

tent for a non-expert witness who knew and had opportunity for observing the mental condition of testatrix, after stating facts upon which the opinion is based, to be asked his opinion as to the soundness or unsoundness of mind of the deceased. The weight to be given such an opinion depends upon the facts stated from which the opinion is formed. (*Brainard* v. *Brainard,* 259 Ill. 613; *Graham* v. *Deuterman,* 244 id. 124.) A witness may be asked as to the ability of the testatrix to transact ordinary business, but it has often been held by this court that the ability to transact ordinary business is not the true test of testamentary capacity. A person who has the ability to transact and understand ordinary business is presumed to have sufficient capacity to make a will, but it does not follow that inability to transact the ordinary business affairs of life renders one incompetent to make a testamentary disposition of his property. Ability to transact business is an element for consideration in determining whether the testatrix had the mental capacity to make a valid will, but the real question is whether, at the time the will was made, she had sufficient mind and memory to remember who were the natural objects of her bounty, recall to mind her property, and make disposition of it understandingly, according to some plan formed in her mind. If she had sufficient mind and memory to do this she was possessed of testamentary capacity, and if not improperly influenced by others could make a valid will.

In *Ring* v. *Lawless,* 190 Ill. 520, the jury were instructed, on behalf of the contestants of the will, that unless they believed, from the evidence, that the testator had sufficient mental capacity to transact the ordinary business affairs of life he could not make a valid will. This was held erroneous. The court said the business transactions of life, such as buying and selling property, adjusting accounts, collecting or paying out money, borrowing money or making loans, involved considerations which do not arise

in disposing of property by will. In the ordinary business transactions of life a person must have mental strength and understanding to compete with an antagonist and protect his own interests. Such transactions involve a contest of reason, judgment, experience and the exercise of mental powers not necessary to the testamentary disposition of property. The court said: "It has often been said by this and other courts that a person who has mental power to understand and transact ordinary business has capacity to make a valid will. The truth of this cannot be doubted, but it must not be understood to mean that that degree of mental power and vigor is requisite to testamentary capacity. Mental perception and power to think and reason of a lesser degree may be all that is requisite to the full understanding of everything involved in the execution of a will. The want of that degree of understanding necessary to enable one to transact the ordinary affairs of life does not necessarily show incapacity to execute a valid will." In that case the bill, in addition to praying that the will be set aside, also asked that certain deeds executed by the testator in his lifetime be set aside on account of testator's lack of mental capacity to make a valid deed. The court recognized the rule that a higher degree of mental capacity is necessary to make a valid deed than is required to make a valid will, and held that while the evidence showed the testator did not have sufficient mental capacity to make a valid deed he did have sufficient mental capacity to make a valid will, and the decree of the trial court was affirmed in so far as it set aside the deeds but was reversed in so far as it set aside the will.

In *Craig* v. *Southard*, 148 Ill. 37, the court said: "The real question submitted to the jury, however, is not whether the party had sufficient mental capacity to comprehend and transact ordinary business, but did he, at the time of making the instrument purporting to be his will, have such mind and memory as enabled him to understand the par-

ticular business in which he was then engaged. (1 Redfield on Wills, 123, 124; *Campbell* v. *Campbell,* 130 Ill. 466; *Greene* v. *Greene,* 145 id. 264; *Stevens* v. *VanCleave,* 4 Wash. C. C. 262; *Harrison* v. *Rowan,* 3 id. 580.) If he did,—if he was able to remember who were the natural objects of his bounty, recall to mind his property, and make disposition of it understandingly, according to some purpose or plan formed in his mind,—he was possessed of testamentary capacity, and with such capacity, uninfluenced improperly by others, he may make valid testamentary disposition of his estate." To the same effect are *Taylor* v. *Cox,* 153 Ill. 220, *Waugh* v. *Moan,* 200 id. 298, *Trubey* v. *Richardson,* 224 id. 136, and many other cases in our Reports.

The situation was not improved by the inquiry whether the testatrix had sufficient mind and memory to understand and comprehend the particular thing in which she might be engaged. If that inquiry referred to every transaction or thing in which the testatrix might be engaged the test was too high and stringent, for a person of entirely sound mind and memory may sometimes be engaged in a 'transaction which he may not fully understand or comprehend. If the inquiry is to be understood as referring to whether the testatrix was capable of making a will and understanding and comprehending it, then it called for the conclusion of the witness as to testamentary capacity and was an invasion of the province of the jury. *Baker* v. *Baker,* 202 Ill. 595; *Schneider* v. *Manning,* 121 id. 376; *Pyle* v. *Pyle,* 158 id. 289; *Keithley* v. *Stafford,* 126 id. 507.

The finding of the jury and the decree of the court could only have been based upon the theory that the testatrix was not possessed of testamentary capacity at the time she made the will, and in our opinion the proof in this record is not sufficient to sustain the decree. It is therefore reversed and the cause remanded.

*Reversed and remanded.*