Marie C. Hanson, a spinster, at the age of 50 years on December 14, 1922, made what purports to be a will giving all her estate, real and personal, to David L. McDonald, who was in no way related to her. She died in July of 1932; the instrument was filed for probate on August 11, 1932. Mrs. Hannah H. Soule, deceased's sister and only heir, filed a protest to the petition to admit the will to probate on the grounds that the decedent was not, on December 14, 1922, menally competent to make a will, and that Dr. David L. McDonald, while acting in the relation of a physician to her, by persuasion and pretended interest in the decedent and by false representations as to the protestant and her husband designed to stir up resentment against them, had gained a dominance over the mind of decedent, ingratiated himself into her trust and confidence, and by design and fraud and undue influence had caused her to make the purported will, which was in fact not her will. The answer to the protest admitted the proponent was a practicing physician, but generally denied all the other allegations of the complaint. The court found for the protestant, concluded that decedent was of unsound mind on December 14, 1922, and incompetent to make a will, and that proponent had *Page 584 
procured the instrument wholly by persuasion, inducement, fraud, and undue influence; found the purported will null and void, and refused to admit the same to probate. On appeal by proponent comes a transcript of evidence of nearly 800 pages, and 68 pages of pleadings, findings, and orders which makes any retailing of the evidence impossible and permits only of summations.
There are 28 assignments of error, 4 of which are amendments adding with more particularity to previous assignments. The assignments strike at rulings admitting and rejecting evidence, at the findings in whole and at particular parts thereof, at the conclusions and decree and at failure of the court below to make findings, conclusions, and decree favorable to proponent, and in refusing to admit the instrument to probate. We shall, when we come to discuss the rulings of the lower court, endeavor to treat these in groups as far as they permit of so doing.
The 4 findings of fact are in considerable detail. In substance, those parts which are undisputed are as follows: Decedent was born 1872. At 4 years of age she had an attack of spinal meningitis making her a semi-invalid and resulting in curvature of the spine, deformity in her back, and nervous troubles. For 12 years she wore braces of one sort or another. She had to wait until she was 10 years of age before she attended school. She was graduated from high school at nearly 22 years of age, suffering thereafter a nervous breakdown which for two years confined her to her room. Her family at that time consisted of her father and sister, the protestant. That during that time she suffered from uncontrollable laughing and crying spells. She lived with her father and sister until 1906 when her sister was married, and thereafter until 1909 lived with her father alone. From 1909 to 1916 she and her father lived with protestant and her husband. In 1916 her father died. Thereafter, decedent lived with protestant's family until her death on July 15, 1932, with the exception of a period from July 1, 1923, to July 1, 1924, during which *Page 585 
period she lived with a Mrs. Dobb. Her physical strength was that of a child. She never sought nor received the association or companionship of any man at any time during her life until Dr. McDonald went out with her. She had a fear of contact with men; was very shy of strangers. There is very little evidence other than that Marie was treated kindly and with sympathy by the Soules even under the trying circumstances which her personality was bound to produce.
In 1911, Dr. McDonald appeared upon the scene. He had been a classmate of O.P. Soule, husband of protestant, from 1892 to 1894. Until 1911, Soule and McDonald saw each other only infrequently. In 1911, Soule invited McDonald to his home, and there introduced McDonald to his wife, to the decedent and her father. From 1913 to 1917, McDonald saw the decedent frequently. He denies it was in a professional capacity or that he ever treated her professionally for mental trouble, but in 1922 for a severe head and throat infection. In 1918, McDonald went to Idaho where he practiced medicine until 1921, when he returned to Salt Lake City and made his headquarters at Soule's office, but denied he had a key to it or had access to the safe. From 1921 to 1923, he saw and talked to the decedent frequently. In December, 1922, McDonald wrote on his own typewriter the purported will left by decedent and on December 14th decedent went to his apartment, and while she was there, McDonald brought in two witnesses who, as far as the evidence shows, had never met or seen the decedent before. The instrument was signed by decedent and the two witnesses, and a few days later was given to McDonald, who had exclusive possession of it until decedent died in July of 1932. Decedent never told the protestant nor Mr. Soule that she had executed a will, and neither of them ever learned of the instrument until McDonald offered it for probate. McDonald, at the time of the execution of the instrument, was about 50 years of age. He had been married and divorced twice before that time. *Page 586 
The above facts, except where indicated, are substantially uncontradicted. In assembling them, we have included but few facts which rest on inference or are the result of the conclusions of witnesses or of the court. They refer mostly to events and happenings rather than states of mind of the decedent or motives on the part of McDonald. The court found further, in its finding No. 1, in view of conflicting evidence, and largely resting on inferences, deductions, or conclusions of witnesses, substantially as follows: That when the decedent lived with her father and protestant during the nervous collapse after her graduation from high school (a) "her mind was filled with evil imaginings, dark forebodings and morbid tendencies"; (b) that she believed she was a martyr and was being persecuted by her own family, and that because she was a middle sister she was a victim of persecution; (c) "that everything that was said, in her mind, was against her"; (d) that "she would have hysterical, morbid and sulky reactions and was afflicted with self pity"; (e) that "she became suspicious and distrustful of everyone and everything"; (f) that later she believed her father and sister and relatives and strangers who came to the home were against her and were "plotting and scheming to injure her"; (g) "and these imaginings became fixed delusions in her mind to such an extent that no argument or reason could dispel them," and that she continued in this state of mind with her father and protestant until August of 1906, when protestant was married.
The court further found she had (h) a "child mind — a mind that had not developed." (i) During that period she wanted to live in the darkness when at home; would remain in her room with the window shades drawn and the room dark most of the time; (j) was afraid to go out alone at night in the darkness; (k) always tried to conceal her back; (l) would not look into a mirror and would turn the mirror in her room toward the wall and keep it that way. (m) She always wanted to be in the presence of one person at a time and when a third person appeared would hurry to her *Page 587 
room; (n) could not control her laughing or crying, and would laugh or cry without any reason or provocation during this period; (o) that she feared everybody, especially men; (p) for long periods she would not go down Main street but would require her sister to purchase clothing for her; that she concealed her activities from everybody; and (q) "lived this period in an atmosphere of mystery and suspicion;" (r) that she was very sensitive, believing people were laughing and talking about her or criticizing or reflecting on her; (s) and believed that "these things were a part of a scheme to injure her"; (t) that she was irritated by any person coming to the house and by any change in the house or furnishings; (u) that persons who saw her during this 10-year period, some daily, some less frequently, "described her as a person who could not reason, and of unsound mind and incompetent to transact business or make a will"; (v) that her delusions persisted during this 10-year period until September 8, 1922, when she suffered another nervous and mental collapse, following her sister from room to room, "asking what she was doing to her"; that she became more hysterical; (w) that "she became violent in her mental reactions"; (x) was untidy in her person, going about the house in her night gown with her hair hanging loose and would stamp on the floor and hammer the table and mutter to herself, until (y) "the neighbors would hear her talking irrationally"; (z) "that she required constant mental nursing"; that "on account of her physical and mental condition, as stated, (aa) "she never went out in any social way with people, except by attending church" and such social relations as she met in the family of the protestant; (bb) that she never in any capacity worked away from home and did little manual work at home because of her incapacity and weakness as herein stated, and (cc) "always depended on her father and protestant for care, comfort and support"; that she never engaged in any business experience and could not carry any responsibility at home or *Page 588 
elsewhere; (dd) "all of which facts were at all times herein mentioned well known to the said McDonald."
We have prefixed the various phrases and clauses of this part of the findings with letters so as to avoid repeating them in the treatment of appellant's assignments. Appellant McDonald assigned the whole of this finding as error, and particularly the parts above designated as (a), (d), (g), (q), (w,) 1-4 (y), (z), (aa), (cc), and (dd). The appellant argues that these are all conclusions, and are unsupported by evidence. This is a law case. Therefore, we cannot disturb the findings if there is any competent evidence to support them. In re Swan'sEstate, 51 Utah 410, 170 P. 452. Moreover, since the case was tried to the court and not to a jury, we must presume that the court ignored incompetent evidence in making a finding, if there is any substantial competent evidence to support it, especially where on a particular issue the incompetent evidence is quite negligible in comparison to the competent evidence. A case tried to the court with a long record of testimony cannot be sent back because here and there incompetent testimony creeps in, if there is otherwise competent testimony to support the findings. There cannot be any objection to conclusions of fact in findings if there is any competent evidence to support the conclusions. It is the business of the trial court to conclude from the basic competent testimony certain facts, which would therefore necessarily be conclusions. They would in many cases, being ultimate or subultimate facts, necessarily be conclusions or inferences derived from what may be called "sense" facts; that is, facts derived from the testimony of witnesses based on the observations or use of the senses of such witnesses. But counsel for the appellant contends that the conclusions of the court contained in its finding No. 1 and above designated as clauses (a), (d), (g), (q), (w), (y, (z), (aa), (cc), and (dd), were founded on evidence which was not "sense" facts, but were themselves conclusions of witnesses. This, to an extent, is true. Decedent's sister, Mrs. Hannah *Page 589 
Soule, testified almost in the words of clause (a), although in the remainder of her testimony she gives reasons for the conclusions contained in the clauses (a) and (b) of the finding, yet the reasons themselves are inferences which she drew from her sister Marie's conduct. Her conclusions as to Marie having "evil imaginings," "dark forebodings," and the latter's feeling that she "was a martyr" and that she "was abused," evidently are derived from what she concluded were Marie's suspicions as shown by her conduct in eavesdropping or saying that they "were plotting against her" and "all doing her harm." Ordinarily, the proper way is to have the witness state the basic things which she has heard or observed from which the state of mind of the person alleged to have said or done them may be inferred. When the observation of the witness is over a long period of time, and the acts, conduct, or sayings of the person observed are many and perhaps trivial and of such a nature as to impress the mind of the observer with their continued inanity, but not sufficiently distinctive to impress the observer's mind with exactness or even with their content of meaning because of their general irrelevancy or incoherence, certain conclusions, if not too broad, would be permissible. Such impressions gained from frequent observations and only once removed from such observations are themselves knowledge.
The appellant moved to strike the testimony of the witness contained in clause (a) (assignment 2). The court denied the motion. It is hardly necessary to consider whether the court was in error in its refusal because the same idea occurs in the evidence in other words at points where no 5 objection was taken or, at least, in regard to which no error was assigned. Moreover, for the following reason: There are four main findings. The first details the facts and deductions regarding the personality and mentality, physique and life of Marie Hanson, upon which personality that of Dr. McDonald impinged. From these facts and deductions comes the ultimate conclusion in *Page 590 
finding No. 3 that Miss Hanson was of "unsound mind and mentally incompetent and incapacitated to execute a will or transact any business whatsoever on December 14th, 1922." If we ignore clauses (a), (d), (g), (q), (w), (y), (z), (aa), (cc), and (dd), which are the ones particularly assigned as error in finding No. 1, we have the same ideas expressed in the remaining clauses in regard to which no specific assignment was made. True, the appellant assigned as error the whole of finding No. 1 on the ground, we surmise, that there was no evidence to support any of it. But a review of the evidence discloses that each one of the remaining clauses to which specific objection was not made was supported by evidence. In fact, as stated previously, the clauses are largely in the words of or an abstract of the evidence. It follows, therefore, that there could have been no prejudice to the appellant in refusing to strike from the evidence the matter contained in clause (a), and no prejudice in including clauses (a), (d), (g), (q), (w), (y), (z), (aa), (cc), and (dd). Assignments 2 and 25 are therefore not well taken.
The twenty-sixth assignment complains of finding No. 2, and particularly of clauses designated hereunder as (4), (14), (16), (17), (18), (23), (24), (26), (27), (32), (35), (37), (38), (39), (40), (41), (42), (43), (44), and (45). Finding No. 2 deals essentially with the conduct of McDonald in relation to Marie Hanson, detailing with particularity much of the evidence often in the words of the evidence. Omitting the facts not in dispute which were previously set out, and contracted and summarized where possible, it is as follows: (1) That McDonald told Mr. Soule that he could see Miss Hanson was not mentally or physically normal, and that (2) he could help her mentally; (3) that from that time on he solicited Soule to employ him to treat decedent for mental ailments and (4) delusions; (5) that in June, 1913, Soule at McDonald's request gave the latter the history of decedent up to that time, detailing matters set out in finding No. 1; (6) that Soule paid McDonald *Page 591 
$70 in October, 1913, for professional services in treating Marie; (7) that McDonald stated again that he could help Marie mentally and (8) thereupon professionally advised her on her nervous and mental ailments continuously thereafter until September, 1923; (9) that from the fall of 1913 to 1917, decedent visited McDonald professionally at his office in Salt Lake City for mental ailments pursuant to the engagements made for such services by Soule; (10) that McDonald during said period requested further compensation from Soule, but the latter refused because it was apparent Marie was not benefiting; (11) that in 1921, when McDonald returned from Idaho, Soule permitted him to use his (Soule's) office for headquarters, giving him a key and allowing him to use the safe to which McDonald knew the combination; (12) that up to the spring of 1921, Marie had been shy toward McDonald, as to all strangers and especially men, and that his visits to the family up to that time actually irritated her; (13) that on a certain Saturday and Sunday while McDonald was staying at the Soule home in the absence of the Soules, during part of said time, Marie became friendly toward McDonald; (14) that "as part of his plan and scheme to procure the execution of the purported will, the said McDonald sought and received the association and companionship of decedent up to and including the 14th day of December, 1922, and continuously thereafter until the 15th day of September, 1923," (15) that he did not take her out socially, but (16) "corruptly and unprofessionally made contacts with her alone in the night time only"; and (17) that he "falsely represented and pretended great sympathy, love and affection for her," and that (18) he "continuously represented to the decedent that the said husband of protestant [Soule] had gotten into possession of her estate and was using it as he saw fit and that he refused after request to account for such property if any; that the husband of protestant and her family had received much benefit from decedent's property and that said husband and his family had been for several years very unkind to her"; *Page 592 
(19) that said representations were made for the purpose of irritating and worrying decedent and to engender in decedent a feeling of distruct and resentment toward protestant, her husband and family, and that they were enemies of decedent and plotting against her to deprive her of her property; and (20) to instill in decedent a feeling of trust and confidence in McDonald and thereby enable McDonald to gain direction and control over the mind of decedent; (21) that between the spring of 1921 and July, 1923, McDonald directed decedent to telephone him when protestant and her family were absent or had retired, and thereupon he would come and remain alone in the dark with decedent until late hours of the night, and at times would take her alone in his auto, returning her at like times; (22) that during the time McDonald made his headquarters at Soule's office, he took from the safe the books and paper of Soule relating to the estate of Marie Hanson's father; and (23) that he reported to decedent that Soule was robbing her and was misapplying and misusing her money; (24) that by said method he "was playing upon the delusions of decedent toward her family and Mr. Soule and irritating and worrying her into a state of mind where she could not control her thoughts and actions"; (25) that said scheme had the desired effect in that McDonald did acquire her trust and confidence during said time and particularly on December 14, 1922, and (26) held control and direction over her mind and will and acts and was thereby enabled to conceal and compel her to conceal from protestant and her family all knowledge of his acts until September, 1923"; (27) that her mental condition grew worse from September 8, 1922, until February, 1923, and (28) that Soule consulted McDonald professionally during this period as to her mental state and in November, 1922, paid McDonald $50 for his services upon his complaint that he was not being compensated; (29) that Soule knew nothing of McDonald's secret associations with Marie or that he had examined his (Soule's) papers; (30) that in the late fall of 1923 the books containing the *Page 593 
Hanson account disappeared and have not since been seen; (31) that in these books were two letters dated November 1, 1918, addressed to the two sisters, Marie and Hannah Hanson Soule, the protestant, respectively, concerning the purchase of the home at 1128 Second avenue, and in regard to the purchase of certain stock in a corporation; (32) that they were never delivered to the sisters, but deposited in the account books for the purpose of preserving the information contained therein for the benefit of the sisters in case of Soule's death; (33) that Marie had never seen said letters prior to 1922; (34) that at the time of the trial they were found in McDonald's possession; (35) that McDonald corruptly misrepresented to Marie that these letters showed misapplication of her funds to Mr. Soule's own use and benefit (36) for the purpose of impairing her mind; (37) that McDonald would "sneak" into protestant's home and would "sneak" decedent out of it, staying with her into the late hours of the night and by this "sneaking arrangement" with decedent concealed from the protestant and her family his secret association with decedent until 1923, and that all the while McDonald was consulting with Soule about the mental condition of decedent; (38) that during the month of December, 1922, and particularly up to the 14th day of said month, by the methods above outlined, McDonald kept decedent from seeking advice of counsel and from disclosing his false representations and his surreptitious and unprofessional conduct, and (39) thereupon "secretly and alone composed, prepared and wrote on his own typewriter with his own hands the purported will," and (40) "caused the decedent on the 14th day of December to go in the nighttime to his private apartment alone, and (41) while decedent was there solicited the two alleged witnesses to said purported will to come to said apartment and to act as witnesses," and that (42) McDonald personally directed the decedent to sign said alleged will and personally directed the witnesses to witness it; and that (43) thereafter he kept said will in his exclusive possession until it was filed, and *Page 594 
(44) that it was never in the possession of the decedent; (45) that said act of Marie was not by the dictates of her own mind but by McDonald's mind; that it was not the free and independent act of decedent but was made and procured by the undue influence of McDonald, without which it would never have been executed.
Then follow findings regarding the manner in which Soule administered the estate of Marie and her father, detailing his disclosures of all the investments, his faithfulness, his and his wife's kindness to Marie, that no accounting by Marie was ever demanded; that she was never dissatisfied with the manner in which the estate was handled until McDonald influenced her; that Marie and Mrs. Soule lived in the same houses for 48 years of their common lives and for 23 years Marie made her home with the Soule family.
The record shows evidence to support the deductions expressed by clauses (14), (16), (17), (19), (24), (27), (32), (37), (39), (40), (41), and (45), which are a portion of those clauses in finding 2 to which assignments are particularly directed. In a case of this sort it is not usually 6, 7 possible to procure direct evidence of the statements and conduct which one accused of undue influence has used on the decedent. One of the two is dead; the other cannot be expected to give evidence against himself. The usual way is to give the surrounding circumstances from which deductions may be made. There was sufficient evidence in the record from which the court could readily deduce the findings found in the last above-named clauses. The appellant vigorously contends that there is no evidence to support clauses (18), (23), and (35). These and other clauses in the findings not expressly assigned as error deal with deductions as to what McDonald told Marie about the manner in which Soule was handling her estate. We think the deductions reflected by these clauses were under all the evidence permissible. True, there is no direct evidence that McDonald ever told Marie the things stated in those clauses. Mrs. Robison and Mrs. Carey testified *Page 595 
that Marie had told them that her brother-in-law, Soule, was mismanaging her estate, and further told them that McDonald said Soule was using her money for his (Soule's) benefit. Ordinarily, this could be admitted only to show Marie's state of mind and not to show that McDonald had caused that state of mind. Standing alone as to him, it would be hearsay. But the deduction that McDonald told Marie the things reflected by clauses (18), (23), and (35) need not be derived from the fact alone that Marie told Mesdames Robison and Carey what she did. It is derived from the facts that McDonald had access to Soule's papers, that the letters of November 1, 1918, disappeared, that they later appeared in McDonald's possession at the time of the trial, that Marie never was shown the letters by any one having authorized control of them, and that she never was concerned about how her estate was being managed until some time in 1922 after the papers had disappeared and McDonald had a chance to see the books, if he did see them, which may be a fair inference, and that she most probably could not have obtained information about some of the things which she spoke about except through some one outside of Spaulding and the Soules, none of whom had shown the letters to her or spoken about their contents. Besides this, McDonald himself admits having talked to Marie about Soule's management of her estate, but says she initiated the conversation. The fact that Marie had mentioned something from which it could be inferred that she must have received information plus the independent circumstances which point to McDonald as the channel through which the information reached her, makes the mosaic complete for the purposes of the deductions contained in clauses (18), (23), and (35), and like clauses in finding No. 2. Moreover, there appears to be very little foundation for the claim that Marie thought herself unkindly treated by the Soules, or that there was not honest management of her estate until the time she was being frequently visited by McDonald. Then this supposed feeling on her part takes expression in *Page 596 
the purported will, typewritten by McDonald, which assigns as a reason for cutting off her sister, the protestant, with whom she had spent practically her whole life, without a cent, that the sister and her husband had been unkind to her for several years past (part of which period McDonald was evidently quite intimate with her), and that her brother-in-law had not rendered her an account of the management of her estate and that he used it as he saw fit. The fact of the disappearance of the letters, the talking over by McDonald and Marie of her affairs, admitted by him, the reappearance of the letters in his possession, the idea in her mind culminating in the expression in the will, which evidently in all the years previously she never communicated to any other person, are all circumstances which make valid the deduction that they were representations by McDonald to Marie that she was being unkindly and unfairly treated.
Clauses (26) and (38) are not supported by any direct testimony, as well they could not be, for the reasons above stated, but when the court concluded that the whole matter of obtaining Marie's fortune was designed by McDonald, as well it might conclude, it fitted in as an irresistible 8 deduction that McDonald had, as part of the plan, influenced her not to obtain legal counsel and not to divulge to the Soule family his associations with her and that he had talked to her concerning Soule's management of her estate. For her to have divulged that information would have "let the cat out of the bag." The inference that he so prevailed upon her is a natural one from all the circumstances.
Clause (42), specifically assigned as error, is contrary to the evidence of the witness Gronemann and McDonald, and is not supported by any evidence, but in the light of all the other evidence so little weakens the final conclusions as to be negligible and nonprejudicial. Clause (44) is not literally but practically supported by the evidence. McDonald testified that Marie kept the purported will in her possession for five days, and then turned it over to him, and he *Page 597 
thereafter kept it nearly 10 years until it was filed. So, to all intents and purposes, it was never under Marie's control. She, during the 10-year period, could never have destroyed it had she wanted to revoke by cancellation.
We now come to the questions as to whether all of the evidence supports the allegation of (1) mental incapacity to make a will, and (2) undue influence. These findings in general form are contained in the third finding; the supporting evidence, as stated before, being practically 9, 10 abstracted in findings 1 and 2. Assignments 14 to 27, both inclusive, bring up these two general questions. We have stated that there was competent evidence to support most of the deductions contained in the first finding, and that those supported by incompetent evidence have the same ideas reflected in other clauses supported by evidence not objected to, or, if objected to, the overruling of the objection not assigned as error. The real question is: Do all the clauses in the finding supported by competent evidence justify a conclusion that Marie was incompetent to make a will? Certainly clauses (a), (b), (c), (d), (e), (f), (i), (j), (k), (l), (m), (o), (p), (q), (r), (t), (x), (aa), (bb), and (cc) of finding 1, taken separately or all together, do not reflect a lack of capacity to make a will considered in the light of her whole mentality. Because a person thinks others are plotting against her or because she broods or is pessimistic or imagines darkly or is suspicious and distrustful, abhors strangers, especially men, is afraid to go out at night in the dark, has a deformed back and is self-conscious of it and desires to hide it, becomes irritated by others, is sensitive, dislikes to talk to more than one at a time, and for long periods would not go down town, is untidy and disheveled during some period of her life, dislikes to see furniture changed about, and like oddities, each separately or all put together, may show some eccentricities, but not lack of testamentary capacity. "Eccentricities and idiosyncrasies, however gross, do not constitute insanity." In re Hanson'sWill, 50 Utah 207, *Page 598 167 P. 256, 262. Many of very sound mind dislike going out at night in the dark and are unfriendly to strangers. This woman all her life practically had been physically crippled. She was very sensitive and introspective. She could not lead the life of a normal woman. Most of her conduct, such as not desiring to look in the mirror or refraining from going on Main street, was due to an exaggerated self-consciousness and sensitiveness. The whole record gives the distinct impression that her mental condition was not due so much to anything inherently wrong with her mind, but rather to a lack of neural energy due to a weakened physical condition and a super-sensitive nature induced by her physical deformities and a knowledge of her self-frustrations. She did not have the energy to keep at mental problems. Her schooling was arduous because of her lack of strength to apply her mind. She did conundrums because they did not require much application, but occupied her mind. Almost all her conduct sprang from self-consciousness, high sensitiveness, and frailness. When she became interested in a thing like Christian Science, she pursued it. She had capacity to travel alone and appreciate books. Along some lines she was sensitized and enlightened beyond the average. Her letters, while they reveal a childlike character, reflect humor and intelligence, although some incoherence in carrying through an idea. She was emotionally unstable, could not control herself at times from laughing or crying; another manifestation of an emotional unstability which may have come not only from a weakened nervous system, but from the strain of repressions on that weakened system. She was forced to repress her desire to physically love and be loved. Dr. McDonald later gave it opportunity for expression. Her psychical disturbances were along certain lines only. Along others, she was quite normal. She was a mixture of the childish, childlikeness, and intelligence. The childish represents her emotional unstability, her distrust, her irritability, and the other mentally undeveloped lines; the childlikeness, her lovable, sympathetic, and trusting *Page 599 
nature; and the intelligence, the lines along which she reached mental adulthood. With a combination like this it is most difficult to determine whether she was mentally incompetent to make a will; but the last above-designated clauses do not reflect elements which in law can be said to show testamentary incapacity in view of the whole picture given by the evidence. Clause (d) does not change the picture much. An emotionally unstable person may be hysterical, sulky, morbid, and affected with self-pity and yet have testamentary capacity. Clause (g), stating that "imaginings became fixed delusions," can only mean, taken in view of all the evidence, that Marie became rather obsessed with the idea that she was a lonely and despised creature, derived from her sensitiveness more fundamentally springing from her consciousness of her physical deformity and lack of mental power. Viewed in the light of all the evidence, which must be done with each piece of evidence as each explains and puts meaning into the others, these were not delusions in the technical sense as that term is used correctly by the psychiatrist. Clause (h) concludes that she had a "child mind — a mind that had not developed." That was true along certain lines only; along other lines she may have had ample testamentary capacity. Clause (n) shows emotional unstability which may aid but is not conclusive in determining lack of testamentary capacity. Clause (s) is again a manifestation of her brooding sensitiveness giving rise to her misapprehending the conduct of others as reflecting on her. It is all of a piece with the other findings along the same line. Clause (u) simply recites what witnesses thought of her, but the evidence shows that those witnesses used the term "unsound mind" to describe a mind not normal, which indeed it was not. Descriptions of a mentality by nontechnical witnesses must be taken in the light of the underlying facts to which they testify to. Opinions to the effect that one "cannot reason" or "is incompetent to transact business" or "make a will," are generalizations requiring *Page 600 
careful scrutiny of the testimony on which such opinions are based.
Here it is necessary to diverge for a moment from our analysis. Because the finding (u) depends on the competency of certain evidence admitted over objection, which rulings were assigned as error, we shall at this juncture consider such assignments, returning later to a continued 11, 12 consideration of whether the clauses in finding 2 can be said in law to support the ultimate conclusion of testamentary incapacity. These assignments relate to the court permitting opinions to be given by lay witnesses over appellant's objections on the ground that such opinions were not sufficiently fortified by underlying facts upon which an opinion could be based. These assignments are 3, 4, 6, 8, 9, 10, 11, and 12. It was held by this court in Re Hanson's Will, supra, that the opinion of lay witnesses as to mental condition cannot be given unless the one who offers the opinion has had a personal acquaintanceship with the person whose mentality is under inquiry and unless such lay witness details the underlying facts upon which his opinion is based, and then his observations must not be too remote from the time of the execution of the instrument. The matter of remoteness depends somewhat on what characteristics the giver of the opinion testifies to. Such as would be unlikely to change or which tended to show some inherent brain weakness or some psychological disturbance of a permanent nature may be given, although observed years before the making of the will. On the other hand, characteristics or observations which come from age or from some physical condition of a nature, removable or variant or temporary, must have been observed in fair proximity to the date of execution of the instrument.
In Schouler on Wills (2d Ed.) § 201, it is stated:
"On the other hand, the great preponderance of our American decisions favors admitting generally the testimony of persons, professional or unprofessional, as to matters of personal observation bearing upon the testator's sanity, with outattempting to discriminate *Page 601 closely between facts and opinion. And in most states an unprofessional witness never was, or else is no longer, confined to a recital of facts from which the jury must draw unaided an inference of sanity or insanity, but may give his opinion touching the testator's sanity as a result of his own observation and familiarity." (Italics supplied.)
In the case of In re Hanson's Will, supra, it is remarked by the court that in these cases, "great latitude is necessarily permitted in introducing evidence upon both the questions of mental capacity and undue influence."
In view of these observations, were the lay witnesses who testified to the mental condition of the decedent (1) sufficiently qualified by observation and familiarity; (2) were their answers sufficiently based on underlying facts given in evidence? Assignment No. 3 claims the trial 13 court erroneously permitted Mr. Rust to answer the following question: "From your acquaintance with her, from 1913, would you say until her death whether or not she was of sound or unsound mind?" He answered, "My own opinion is that she wasn't normal. That was my opinion regarding her in Dec. 1922." His acquaintance with Marie was from 1913 until her death, but his contacts with her were limited. He gives his reasons why he entertained the opinion he did as to her mental condition. The answer he gave that she was not normal does not necessarily imply that she was incompetent to make a will. It is well borne out by all of the testimony that she was not normal. The answer was therefore commensurate with the observations, and cannot be prejudicial.
The same witness was asked, "Do you think, in December, 1922, that she was capable of transacting business dealings or engaging in business transactions?" Over objection, he answered, "Well, I never thought she was mentally developed when I saw or heard her speak." This is in exactly the same category. It was of service in giving a general idea of the decedent's mentality which, together with other evidence, might aid the court in arriving at her *Page 602 
testamentary capacity. In itself it did not attempt to go the length of saying that she was incapable of making a will. There was no error in overruling the objection because the answer was coextensive with the underlying facts on which the opinion was based and did not go beyond the permissible inference which they furnished.
The answer of George Guiver, who had seen the decedent off and on for a number of years from 1913 to her death in 1932, reads in part as follows. "I thought in my mind she wasn't responsible. I didn't think she was capable of taking care of herself without someone to watch over her, because she acted so funny and would laugh and didn't appear to me to have a right 14 mind." The answer does no more than give the witness's impression of the decedent's mentality based on her conduct as he observed it. He did not attempt to say whether she had testamentary capacity. His answer, in view of all the other evidence the court had, would of necessity receive a measured interpretation, and was not prejudicial. No error was committed in refusing to strike it. The same observations are applicable to the answer of Golden Guiver, who stated,
"She would start in to talk and tell me something, first thing she would stop, forget what she was saying and start and talk about how she was living or something and then she would say, oh I remember now. Her mind was almost running that way all the time. She would keep forgetting what she was talking about. Her appearance used to look kind of funny. She used to talk so much and run on kind of nonsense. I didn't pay much attention to what she said. * * * I think she was kind of out of her mind."
It is difficult to see how much more enlightening evidence as to the manner of the deceased could be elicited to show incoherence. The phrase, "I think she was kind of out of her mind," must be interpreted as in the case of all such lay expressions in the light of its underlying supporting facts. There was no error in refusing to strike this answer.
The witness was then asked, "What would you say was her mental condition in 1922, in reference to her making a *Page 603 
will?" to which objection was interposed on the ground that the witness was not competent to express an opinion on that question, and because it called for an answer on the 15 ultimate question to be decided by the court. The objection was well taken. Lay witnesses may testify from their knowledge as to facts which show the mental condition of the testator and may give their opinions as to the mental condition of the testator. In re Swan's Estate, 51 Utah 410, 170 P. 452. But a witness cannot be asked the direct question as to whether the decedent had testamentary capacity. In Schouler on Wills (6th Ed.) p. 267, § 224, it is set out:
"An unprofessional witness * * * may in many states be allowed to state whether the conduct of the testator was rational or irrational, but he cannot be asked directly whether the testatorhad testamentary capacity, as that is a question for the jury" (Italics supplied) — citing Wear v. Wear, 200 Ala. 345,76 So. 111; In re Sturtevant's Estate, 92 Or. 269, 178 P. 192, 180 P. 595; Coleman v. Marshall, 263 Ill. 330, 104 N.E. 1042,1045, all of which bear out the principle mentioned in the text.
In Page on Wills (Ed. 1901) § 392, it is stated,
"The form of the question which calls for an opinion as to the testator's sanity from a witness competent to give an opinion and the nature of the opinion called for, are very important topics in the actual trial of a case. A form not infrequent is something like this: `In your judgment was testator competent to make a will?' This form finds justification in the language used in many cases where the precise point has not been presented for consideration, but it is inherently vicious, as it presupposes that the witness knows the degree of capacity the law requires in order that the testator may make a valid will, and in addition to the opinion of the witness as to testator's sanity, such a question calls for the opinion of the witness as to the law. Accordingly the courts which have considered this exact point have held such question improper. So the witness cannot be asked if the testator had `mental capacity to make a will' or any similar form of question which assumes that the witness knows what the legal requirement of testamentary capacity is." CitingKempsey v. McGinniss, 21 Mich. 123; Brown v. Mitchell, 88 Tex. 350,31 S.W. 621, 36 L.R.A. 64 (which contains a rather exhaustive review of a number of cases); Walker v. Walker'sEx'r, 34 Ala. 469; Schneider *Page 604 
v. Manning, 121 Ill. 376, 12 N.E. 267; Buys v. Buys,99 Mich. 354, 58 N.W. 331; Farrell's Adm'r v. Brennan's Adm'x,32 Mo. 328, 82 Am. Dec. 137; Clapp v. Fullerton, 34 N.Y. 190, 90 Am. Dec. 681; Hewlett v. Wood, 55 N.Y. 634; Runyan v.Price, 15 Ohio St. 1, 86 Am. Dec. 459; Gibson v. Gibson, 9 Yerg. (Tenn.) 329; In re Blood's Will, 62 Vt. 359, 19 A. 770; all of which except Buys v. Buys support the text.
"What degree of mental capacity is necessary to enable a testator to make a valid will, to what extent and with what degree of perfection he must understand the will and the persons and property affected by it, or to what extent his mind must be impaired to render him incapable, is a question of law exclusively for the Court, with which the witnesses have nothing to do. And it is a question of law of no little difficulty, which calls for the highest skill of competent jurists, and upon which the ablest courts are not entirely agreed." Kempsey v.McGinniss, 21 Mich. 123, at page 141.
The rather detailed consideration of the evidence contained in this opinion in the instant case to determine whether the lower court was correct in finding lack of testamentary capacity, bears out the observation of the Kempsey Case. The court, therefore, erred in not sustaining the objection; but in view of our conclusions in relation to the matter of undue influence the ruling is not ground for reversal.
The question directed to Georgina Guiver did not invite an opinion as to testamentary capacity, but as to the testatrix's "mental condition," based on the witness's observations as to appearance, conduct, and conversation of the testatrix. In New York and some other states, even an expert may 16-18 only testify to the soundness or unsoundness of a testator's mind (not to his testamentary capacity); the lay witness with knowledge of and familiarity with the testator being limited to state his impression as to whether the testator was rational or irrational judging from the acts and conversations to which the witness testifies in regard to the testator. Clapp v.Fullerton, 34 N.Y. 190, 90 Am. Dec. 681; Hewlett v. Wood,55 N.Y. 634. In other states the rule is not so narrow. SeeWear v. Wear, supra, and Coleman v. Marshall, supra. *Page 605 
Such questions as to whether the testator was capable of transacting ordinary business or his business, or whether he was of sound or unsound mind, or his mental condition or mental capacity, all call for the witness's impression on particular matters of different import. In re Estate of Van Alstine,26 Utah 193, 72 P. 942, the question called for a lay opinion as to the "mental condition" of testator. The court decided that a lay witness could sum up his observances as to a testator's actions, conduct, or conversation in the form of a general impression as to "mental condition" of the testator, but the court's attention was directed not to the import of the phrase "mental condition," but to the broader question as to whether a lay witness could give any opinion concerning the mentality or capacity of a testator where such opinion was based on underlying "sense" facts, or whether such facts must be given to the jury for its conclusions without the help of the witness's impression of the testator's mentality.
In the case of In re Hanson's Will, supra, the form which a summation question to the lay witness may take was not specifically before the court, although the court did say:
"All that can be said is that a witness should be permitted to state the facts fully, and if from the detailed facts the jury may draw an inference that the subject of the inquiry was ofunsound mind, the witness may also be permitted to express his opinion respecting the sanity." (Italics supplied.)
The case of In re Swan's Estate, supra, followed the general principle that laymen properly qualifying themselves may give testimony relating to the question of testamentary capacity, but did not hold that a layman could directly give his opinion as to the testamentary capacity of a testator. In the case of Brown
v. Mitchell, 88 Tex. 350, at page 358, 31 S.W. 621, 625, 36 L.R.A. 64, it is stated:
"An opinion as to sanity or insanity does not express a legal conclusion, but is simply an opinion as to a mental condition, which is allowed in this class of cases by nearly all courts." *Page 606 
We believe the form of question calling for an opinion as to the decedent's mental condition as the witness was impressed by the underlying facts he testified to was proper, not calling for a conclusion as to testamentary capacity. Objection was taken to the question under consideration not only on the ground of incompetency to state such a conclusion at all events, but on the ground that there was not sufficient foundation, which was also one of the grounds advanced in the objections urged to some of the other questions we have been considering. The matter of proper foundation or qualification of a witness to state a conclusion, an opinion or an impression, where the same is permissible in evidence, lies largely in the sound discretion of the trial court. Unless it appears that the evidence of underlying or "sense" facts is so inadequate as would compel this court to say as a matter of law that the trial court had erred in permitting a conclusion to be stated, the permitting of such conclusion to be stated will not be disturbed. The trial court has the duty first to determine whether there are any underlying facts testified to from which the jury could draw an inference as to mental condition. See In re Hanson's Will, supra; Buys v.Buys, supra. If there is not sufficient of such facts, the court must refuse to permit the witness to state a conclusion, whatever the conclusion, which might be permissible had there been sufficient underlying facts. But when there are some underlying facts from which the jury could draw an inference of other than normal mental condition, then whether there is sufficient foundation for the expression of an opinion by the lay witness or whether such opinion would be helpful to the jury rests almost altogether in the judicial discretion of the trial judge. We find no abuse of the discretion of the trial judge in that regard.
Assignment No. 12 specifies error in permitting Dr. Curtis to answer a hypothetical question of great length purporting to take in the material facts in Marie's life which would aid the doctor in arriving at an opinion. It is difficult to see how the inclusion in the hypothetical question of *Page 607 
the evidence of Dr. McDonald's secret meetings with Marie or his alleged representations to her could aid in determining whether she was mentally competent. The expert witness could not be and was not called on to give an opinion concerning undue influence. It will serve little purpose, and lengthen this already long opinion, to analyze the elements in the long hypothetical question propounded to Dr. Curtis. Owing to the fact that the judgment must be affirmed, because the finding of undue influence is amply supported by evidence, we may escape the task of analyzing this hypothetical question in order to see if it will withstand the objections aimed at it.
One other assignment of error needs to be taken up before we return to a consideration of the question from which we were, because of a necessity to determine whether certain evidence was properly admitted, forced to divert our attention. Assignment No. 1 contends that the court was in error 19 in sustaining an objection to the following question propounded to one of the subscribing witnesses to the purported will, Mrs. Gronemann, and running as follows:
"From what you observed there, Mrs. Gronemann [at the time and place the decedent signed the instrument], and the conversation and what Marie said, were you able to form an opinion as to whether she was sane and knew what she was doing?"
The rule is that a subscribing witness may testify as to the mental condition of the testator at the time of subscribing to the will without the necessity of laying a foundation for the conclusion. It is an exception to the rule that a lay witness cannot give a conclusion or opinion without reciting the underlying or "sense" facts on which such opinion is based.Gibson v. Gibson, 9 Yerg. (17 Tenn.) 329; Clapp v.Fullerton, 34 N.Y. 190, 90 Am. Dec. 681; Schouler on Wills (6th Ed.) § 232.
"It is settled by the almost unanimous weight of authority that the subscribing witnesses to a will may give their opinion as to the sanity or insanity of the testator without any reference to their means *Page 608 
of determining his mental capacity, or their ability to judge of his capacity with the means at their disposal." Page on Wills
(1901) § 388.
The court should have permitted the question to be answered. However, it appears that the witness Gronemann was fully permitted to give her opinion as to the mental condition of the decedent at the time the latter signed the instrument, in answer to other questions. The question here presented in respect to the court's refusal to permit the above-quoted question is therefore moot.
Having now sufficiently considered the rulings of the court on admitting evidence which forms, in part at least, support for the finding designated (u) in finding No. 1 above set out, we may proceed with our consideration of the question whether there was any competent evidence on which to find that 20 the decedent was mentally incompetent to make a will. Since the jury and no one else had the right to conclude as to whether she was incompetent to make a will, testimony that she was not so competent must be ignored. Such testimony as to her being of "unsound mind," unable to "transact business," or that she "could not reason," must all be measured and limited in its content by the underlying facts given in support of such impressions and in the light of all the other testimony. They are elastic phrases which may mean much or little, depending on the sense in which they are used and the contents with which invested. A person may not be capable of conducting ordinary business because not trained in it or even if incapable mentally may in cases be capable of making a simple will. The true test is as to whether the testatrix had "sufficient mind and memory [at the time of making the will] to remember who were the natural objects of her bounty, recall to mind her property, and dispose of it understandingly according to some plan formed in her mind."Coleman v. Marshall, supra.
The finding (v), that "her delusions persisted," etc., again refers to delusions in a popular sense, and not in the *Page 609 
technical sense. The evidence does not meet the requirements to prove a delusion in the technical sense. See Schneider
v. Manning, 121 Ill. 376, 12 N.E. 267; In re Hanson's 21Will, supra; 1 Underhill on Wills, § 94. A mistaken idea obstinately held is not a delusion. This woman did not disinherit her sister because of a delusion, but partly because of an influence which fed a mistaken idea that her family was against her. Finding (y), that the "neighbors would hear her talking irrationally," is under the evidence of very little value, as it appears not to have been constant; but one neighbor heard her muttering while in her room. The Soules themselves did not state that she talked irrationally to herself.
We have considered the evidence carefully to determine whether there is evidence from which the court could conclude that on December 14, 1922, the decedent did not have testamentary capacity. It is a case in which the transcript of testimony probably permits us to determine whether in 22 law such conclusion could be arrived at equally as well as hearing the witnesses. It is not as if the decedent had been a witness in the lower court, in which case her actions could be observed. We have considered the testimony with some care in this opinion because we believe there is a tendency to consider those testators who cut off the natural objects of their bounty as incompetent to make a will because of a combination of circumstances, such as idosyncrasies and eccentricities, queerness, untidyness, obstinate opinions, or understandardized thinking. In this case we have considerable doubt whether Marie did not have sufficient mental capacity to make a will. In some ways she appears to be quite intelligent. Because of her physical deformity and lack of opportunity to live the life of a normal woman, she was shy, suspicious, sensitive, irritable, self-conscious, retiring, and disinterested in what people who lead a normal life generally are. Coupled with these characteristics was a weak body and impaired nervous system, resulting in emotional unstability and lack of control. *Page 610 
Yet she longed for sympathy and to express herself, which led her frequently to seek company and conversation with others and to turn her interests to childlike occupations as well as to those things which gave her a refuge from herself and her repressions, such as Christian Science. The benefit of this doubt which we entertain should be given to the findings of the trial court in its conclusion that Marie was incompetent to make a will.
While there may be some doubt as to whether the decedent lacked testamentary capacity, there is no doubt but that it was a mind easily capable of being influenced. The evidence relating to Marie's mentality and general nervous control is therefore material and of aid not only in determining testamentary capacity, but to determine what sort of a subject Dr. McDonald had to play upon. A strong mind is not easily influenced. Therefore, all the evidence of mentality and its strength or weakness is material on the issue of undue influence. The issue of undue influence involves two main lines of inquiry: (1) What type of person is it claimed was influenced? and (2) How or by what means was such person influenced?
By what has been brought out above, it amply appears that Marie's mind, even though it may not have lacked testamentary capacity, was one easily susceptible of being played upon. In the light of Marie's mental capacity and Dr. McDonald's conduct, there is ample evidence to support the finding of undue influence. We need not discuss the evidence of the means used to influence it. It is sufficiently reflected in the 45 clauses and the additional matter contained in finding No. 2 set out herein. As stated before, these are supported by competent evidence. The influence exerted by Dr. McDonald was not only undue, but designed and perfidious. Nothing more need be said in this regard.
The judgment of the lower court is affirmed, with costs to the respondent.
ELIAS HANSEN, C.J., and FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.
 *Page 1