(Nos. 23776, 23868, 23940.—

WILLIAM N. HAIRGROVE *vs.* THE CITY OF JACKSONVILLE, Appellee.—(WILLIAM T. WILSON, Exr. *et al.* Appellants.)—THE ILLINOIS POWER AND LIGHT CORPORATION, Appellant, *vs.* THE CITY OF JACKSONVILLE, Appellee.

*Opinion filed April 16, 1937.*

164

WILSON, J., took no part.

WILLIAM N. HAIRGROVE, *pro se*, and DRYER, BROWN & POOS, and BELLATTI, SAMUELL & ARNOLD, for appellants.

BARBER & BARBER, ORVILLE N. FOREMAN, and E. W. CLEARY, for appellee.

Mr. JUSTICE STONE delivered the opinion of the court:

These causes, consolidated here for opinion, present separate direct appeals from orders and a decree entered in the same cause of action, by the circuit court of Morgan county.

William N. Hairgrove, appellant in cause No. 23940, as a tax-payer of the city of Jacksonville, filed his bill on behalf of himself and all other tax-payers of that city, to enjoin the city of Jacksonville from issuing $420,000 mortgage certificates under section 9 of the Municipal Ownership act and from constructing and operating a municipal electric light and power plant, as proposed by an ordinance of that city. The city answered the bill on March 13, 1936. On the following day the Illinois Power and Light Corporation, appellant in cause No. 23776, (hereinafter referred to as the Light Company,) by leave of court, and without objection from plaintiff Hairgrove, intervened as a party plaintiff and filed an amendment to the original complaint to which it made Harold L. Ickes, Administrator of Public Works, and C. H. Bauer, State Director, parties defendant. On March 23, 1936, the city filed its motion to vacate the order of March 14, authorizing the appellant Light Company to intervene as a party plaintiff. On hear-

ing, the court vacated its order of March 14 and struck the complaint of appellant Light Company, and dismissed it out of the case, and dismissed Ickes and Bauer as defendants. Thereafter on April 8, 1936, appellant Light Company filed a second motion for leave to join and become a party plaintiff, to adopt the allegations of the complaint on file, to add allegations and to make new parties defendant. The amendment sought to be filed was the same in substance as the amendment previously filed which was stricken by the court. This motion alleged that the plaintiff did not bring his suit in good faith but in collusion with attorneys for the city, who prepared the complaint. The sufficiency of the original complaint was not questioned. At the hearing on this motion the Light Company offered evidence in support of its allegation of collusion. Its motion was denied on the ground the amendment presented new issues including Federal questions when only State questions had been raised by the original complaint, and since Ickes and Bauer were made defendants only as to such Federal questions, they were not properly brought in as defendants. On April 3, 1936, Bert Foster and W. L. Saville, appellants in cause No. 23868, by leave of court, joined and became co-parties plaintiff and adopted the complaint originally filed.

The complaint alleges the invalidity of the ordinance, herein known as No. 358, passed by the defendant city and adopted by a vote of the people, providing for the acquisition, construction, establishment, ownership and operation of a municipal electric light and power plant, under the Municipal Ownership act. (State Bar Stat. 1935, chap. 111a, p. 2483.) Ordinance No. 358 provides for the issuance of mortgage certificates in the sum of $420,000 payable solely from income or revenues derived from the operation of the municipal public utility thus acquired and constructed, exclusive of present owned lighting system and all other property, such mortgage certificates to be secured

solely by mortgage and pledge of the tangible property and income of the utility so acquired, without encumbering or pledging any present owned property and without granting any franchise or creating any indebtedness of the city, within the meaning of any constitutional or statutory limitations affecting such indebtedness. The ordinance also provides for the segregation of revenues derived from the new plant from other revenues of the city. On December 5, 1935, another ordinance, No. 359, was passed, calling a special election submitting to the voters of the city, on January 21, 1936, (1) the approval of ordinance No. 358; (2) whether the city should operate such a plant, and (3) whether utility certificates not exceeding $420,000 should be issued by said city for said purpose. All of these propositions were approved at that election.

The complaint alleges numerous grounds, hereinafter noted, upon which complainants base their charge that ordinance No. 358 is void. By its answer the city denies the alleged invalidity of the ordinance. On hearing the bill was dismissed for want of equity. Hairgrove and the co-plaintiffs appealed separately. Hairgrove's appeal is numbered 23940. Foster's and Saville's appeal is numbered 23868. The Light Company also appealed from the orders denying it the right to come into the suit as a party plaintiff and that appeal is here as No. 23776. We first consider the contentions arising on causes Nos. 23868 and 23940.

The errors assigned by the original plaintiff and co-plaintiffs are as follows: (1) The ordinance, including the plans and specifications, fails to describe the proposed municipal electric light and power system, (2) excluded evidence should have been admitted, (3) the effect of the ordinance is to make the entire cost of the plant a general obligation of the city, which, added to its existing indebtedness, exceeds the constitutional and statutory limits of such indebtedness, (4) that the ordinance should have provided that a franchise be granted by the city to the proposed

utility, for a reasonable consideration, for the use of the streets and alleys and that such franchise be mortgaged so that upon foreclosure and sale the purchaser would take the franchise, and (5) the ordinance is illegal and void because it does not provide that the contract for the construction of the plant be made at public letting.

It is admitted that if the ordinance provides for mortgage certificates which constitute a general indebtedness of appellee city, an indebtedness will thus be created far in excess of constitutional limitation, and the ordinance is void. Appellee insists, however, that no such indebtedness will be created.

This court has had frequent occasion to define the term "indebtedness" as used in section 12 of article 9 of the constitution. One of the early cases is *City of Springfield* v. *Edwards,* 84 Ill. 626, in which that term, as specified in the constitution, is defined as a voluntary incurring of legal liability to pay. Within that definition is included a debt payable in the future as well as one payable presently. There is also included therein a debt payable upon a contingency, as upon the happening of some event such as the rendering of service or delivery of property. Also, if a contract or undertaking contemplates a liability to pay, the debt exists and it makes no difference whether the debt be for necessary current expenses or for some other purpose. To the same effect are *Village of East Moline* v. *Pope,* 224 Ill. 386; *City of Chicago* v. *McDonald,* 176 id. 404; *Prince* v. *City of Quincy,* 128 id. 443; *Culbertson* v. *City of Fulton,* 127 id. 30; *Howell* v. *City of Peoria,* 90 id. 104, and *Law* v. *People,* 87 id. 385. Whether the mortgage certificates to be issued under authority of the ordinance before us create an indebtedness beyond constitutional or statutory limitations, depends upon what is attempted under and by the ordinance. Certain plans and specifications on file with the city clerk are, by the ordinance, made a part of it. An applicable rule of construc-

tion requires that the meaning and intent of the ordinance be gathered from the language of that instrument.

Concerning appellants' claim of insufficiency of the description of the plant, equipment and property proposed to be acquired, the point is made that since under section 3 of the Municipal Ownership act the ordinance is required to "describe the plant, equipment and property proposed to be acquired or constructed," the definiteness of the ordinance, as to description of the utility, must equal that required under the Local Improvement act. The language of that act is: "Such ordinance shall prescribe the nature, character, locality and description of such improvement." In determining the sufficiency of the description of this ordinance, the plans and specifications must be considered with the language of the ordinance. The plans have been drawn to scale and show all proposed dimensions. Though the description of the improvement in the ordinance is quite in detail, covering sixteen pages of the abstract, numerous items are cited by the appellants as not being sufficiently described. No useful purpose would be served in extending this opinion to discuss these objections in detail. They are numerous and all have been considered. An examination of the plans and specifications, in connection with the ordinance, discloses that the descriptions objected to are set forth with definiteness. The ordinance describes the character of the improvement, the materials to be used and the type of construction required, and, with the plans and specifications, shows dimensions and the like. Section 3 of the ordinance, which has to do with the description of the improvement, also includes the general requirement that the distribution system and all equipment shall be constructed strictly in accordance with and shall conform to the latest accepted and approved standards for such construction, and in compliance with the provisions of The National Electric Code and the present standards of The American Institute of Electrical Engineers, and that all

fuel oil tanks are to be of welded steel construction designed according to specifications of the American Society of Mechanical Engineers.

Counsel for appellants argue that the ordinance must, in its description, be sufficient for bidding purposes and to enable a property owner to see just what the city is getting, as is required by the Local Improvement act. There is no such express requirement in the Municipal Ownership act, and unless the two provisions are to be construed as requiring the same degree of definiteness, appellants' contention cannot be sustained. Cases cited under the Local Improvement act require such definiteness as will not only give all necessary information for bidding on construction work but will also enable the property owner to see just what he is, by special assessment, required to pay for. A consideration of the purpose of an ordinance under the Municipal Ownership act, as compared with one under the Local Improvement act, will disclose some quite definite differences. Under the former, the ordinance is an authorization to the city to contract for the construction of a municipal utility plant, and while the ordinance must be sufficiently definite to require that a utility of certain description be contracted for, yet the reason for requiring detailed description under the Local Improvement act does not apply with equal force to proceedings under the Municipal Ownership act. Under the former, the property owner pays for a large part, if not all, of the local improvement, by special assessment, and is therefore entitled to know with definiteness just what he is paying for, while under the Municipal Ownership act the property owner pays nothing. No debt is to be created. The act contemplates that the city shall, after the adoption of the ordinance, contract for such facilities under the provisions of that ordinance, section 3 of which contains the following provision: "Said municipal electric light and power public utility shall in all respects be constructed in accordance with and

pursuant to the plans and specifications therefor heretofore approved by the city council of said city and placed on file in the office of the city clerk and open for public inspection." The purpose of the act concerning the ordinance and its publication is to fairly inform the voter of the nature and extent of the proposed utility. True, as argued by appellants, the ordinance with the plans and specifications must be sufficiently definite that neither an inferior nor more costly improvement may be constructed. We think this ordinance complies with that requirement.

It is also argued that the ordinance was not legally published, in that the plans and specifications were not published with it. The ordinance shows that plans and specifications are provided, as a part of the ordinance, and are on file in the city clerk's office and open to inspection. In considering whether the plans and specifications adopted by the ordinance and filed in the clerk's office, should also be published with the ordinance, it must be borne in mind that the purpose of publication is to inform the voter of that upon which he is to vote. Publication of such an ordinance differs somewhat from the publication required of an ordinary ordinance of the city council, where no other notice of its provisions is brought to the public. The impracticability and large cost involved in publishing plans and blue prints, is apparent to anyone. The public attention drawn to this ordinance by the campaign for and against its adoption, assured to the fullest extent possible, a familiarity on the part of the voters with the provisions of the ordinance. We are of the opinion that it was not essential to the validity of this ordinance that the plans and specifications be published.

Appellants also argue that applicable provisions of the Municipal Ownership act have not been complied with, in that no franchise is granted the new utility; that the act requires such franchise which must also be mortgaged to secure the certificates, so that upon foreclosure and sale

the purchaser may take such franchise. It is conceded that municipal corporations have no powers except those granted by legislative enactment and that a power so granted may be exercised only in the manner stated in the grant and not otherwise. (*City of Carlyle* v. *Nicolay,* 333 Ill. 562.) Section 1 of the Municipal Ownership act, (State Bar Stat. 1935, chap. 111*a*, p. 2483,) authorizes a city to acquire or construct a public utility such as here involved for the purpose of operating the same for a period of not longer than twenty years, to fix the rates and charges for services and to make all needful rules and regulations pertaining thereto. Section 3 provides that no city may thereunder acquire or construct a public utility until an ordinance providing therefor has been passed by the city council and approved by the people; that such ordinance shall describe the plant, equipment and property to be acquired or constructed and shall provide for the issuance of bonds, mortgage certificates or special assessment bonds as in the act authorized. Section 9 of the act, under which appellee city is proceeding, provides that in payment for such new utility and equipment the city may issue and dispose of interest-bearing certificates called public utility certificates, which shall, "under no circumstances, be or become an obligation or liability of the city or payable out of any general fund thereof, but shall be payable solely out of the revenues or income to be derived from the public utility property for the acquisition of which they were issued." A limitation upon the amount of such certificates is there provided. Security for the payment of such certificates and the interest thereon is provided in the following language: "The city may convey, by way of mortgage or deed of trust, any or all of the public utility property acquired or to be acquired through the issue thereof; * * * Any such mortgage or deed of trust may carry the grant of a privilege or right to maintain and operate the public utility property covered thereby, for a period not exceed-

ing twenty (20) years * * * which privilege or right may fix the rates or charges which the person or corporation securing the same as the result of foreclosure proceedings shall be entitled to charge in the operation of said property for a period not exceeding twenty (20) years." The act also provides for foreclosure of the mortgage securing the utility certificates and a sale thereunder. Counsel for appellants say that in the provision that the mortgage "may carry the grant of a privilege or a right to maintain and operate," and in the language, "which privilege or right may fix the rates," the word "may" is to be construed as "must," and since this ordinance does not provide a franchise but expressly declares that such shall not be issued, it does not comply with the act.

The rule is that the word "may" shall be construed to mean "must" or "shall" in those cases, only, where the public interest and rights are concerned, and where the public or third persons have a claim *de jure* that the power shall be exercised, or where it is necessary to so construe it to carry out the intention of the legislature. *Foutch* v. *Zempel,* 332 Ill. 192.

Counsel for appellants argue that it is to the public interest that this ordinance provide a franchise for otherwise they may not be able to sell their securities at par. Counsel for appellee counter with the statement that they already have a purchaser of the certificates who will take them at par with four per cent interest. Much argument appears in the briefs on both sides concerning the construction for which appellants contend. Section 3 of the act specifies that one of three methods of financing the project shall be by the issuance of utility certificates secured by mortgage. It seems clear that, since the act nowhere specifies or authorizes certificates without such mortgage, the legislature intended by the language in section 9, which provides that the city "may" convey by way of mortgage to secure the public utility certificates, not only to grant the

power to the city to mortgage, but it was also the legislative intent that the word "may," as there used, be construed as "must" or "shall." It does not follow, however, that in all instances where the word "may" is used in section 9, it shall mean "must" or "shall." To so hold would bring about results not contemplated by the legislature. It is not essential to the existence of a valid utility certificate and mortgage to secure the same that a franchise be granted or rates fixed. The fixing of rates, as well as the determination of the question whether the purchaser under foreclosure sale of such utility shall have the right to continue in the use of the streets, are matters held by this court in *City of Geneseo v. Illinois Northern Utilities Co.* 363 Ill. 89, to be vested in the Commerce Commission. To require the granting of a franchise for a consideration, and fix rates, and to make both subject to the mortgage, may raise doubt as to whether such a mortgage creates a debt, and if so, those cities whose indebtedness would thus overrun constitutional or statutory limitations would be rendered incapable of taking advantage of the act. We do not decide that question here, as it is not before us, but think it may well have been in the minds of the legislators in passing the act. As there is no other provision of the act indicating a legislative intention that "may" be construed as "must," when applied to the issuance of a franchise or fixing a rate, we think it was not the legislative intent that it be so construed. No public interest or right requiring such a construction applies here.

It is also argued that the plan, as constituted by the ordinance, will result in the increase of indebtedness of the city of Jacksonville beyond constitutional and statutory limitations. Appellants say that this is so, first, because the city has made certain contracts and has become liable to pay certain sums to engineers out of the general funds of the city, thus requiring the city to contribute tax-derived funds toward the cost of the plant, and that this renders the whole

cost of the project a debt of the city. They say, also, that certain feeder circuits, and the like, will pass over private property and that sites for them and for the generating plant, cannot be legally acquired without raising the indebtedness above constitutional limitations; that property already owned is to be made subject to the mortgage and the income therefrom used in the discharge of the utility certificates, and that this results in increasing the indebtedness of the city beyond legal limitations. So far as the payment of general funds to the engineers is concerned, it is sufficient to observe that the ordinance requires that all costs of the acquisition or construction of the utility shall be paid for out of funds arising from the sale of utility certificates. The service of an engineer is a necessary part of the cost of the construction. The ordinance does not require that engineers' services be paid out of general funds of the city and this court has not before it a question of the misappropriation of public funds. Appellants' counsel say, also, that the income from the light and power facilities now owned and operated by the city is to be used with that from the new utility to pay the certificates, and that these facts render the whole project a debt of the city.

The ordinance, by section 3, specifically provides that the present facilities, including what is known as the White-Way Ornamental Lighting System, "now owned and operated by the city, shall remain distinct and apart from and shall in nowise be deemed to form a part of the municipal electric light and power public utility authorized by this ordinance." Provision is made permitting the city to connect those facilities with the new if it desires to do so. The provision of the ordinance regarding the mortgaging of property, specifically excludes present owned property or the income therefrom. The ordinance specifically provides that the thing to be pledged is the utility acquired, or constructed, by funds arising from the sale of certificates.

If the present facilities, including the White-Way Ornamental Lighting System, are connected with the new system for the purpose of taking current, and a foreclosure and sale takes place, the city will not thus lose its present lines and facilities.

Counsel for appellants say that the ordinance does not require the separation of income derived from the "White-Way" and other present owned facilities from that to be derived from the new system, and that the use of such income to pay the mortgage certificates has the effect of making these utility certificates a debt against the city. A debt is an obligation to pay. If the city is in no way obligated to apply the income from the present facilities to the payment of the utility certificates, then such use of that income is a gratuity, and while the language of the Municipal Ownership act is that the certificates shall be payable solely out of income derived from the newly acquired property, the word "payable," as there used, is to be construed as specifying the only source to which the holder of the certificates has a right to look for payment. Nothing in the act prevents the city from voluntarily applying income from present owned facilities, if it chooses so to do, though it is not required to do so, and such facilities, or their income, are in nowise pledged. Such neither creates a debt nor invalidates the ordinance. The holders of these certificates cannot require that such income be so used and so no obligation is made. Whether such use of the city funds may, from other considerations, be legal or illegal, does not render this ordinance invalid, as there is no requirement that such income be used, and the question of the legality of such use will not arise unless and until such use of income is made.

In *City of Joliet* v. *Alexander,* 194 Ill. 457, present owned property and the income therefrom was pledged under the mortgage. There was no question there of the city making a voluntary contribution of income. In *Maffit* v.

*City of Decatur,* 322 Ill. 82, the city put $35,000 of its present owned funds into a project of increasing waterworks facilities. Such was, however, held not to create a debt. So in *Ward* v. *City of Chicago,* 342 Ill. 167, and in the *Maffit case,* the income from present owned property, as well as that newly acquired, was, by ordinance in the former case and by contract in the latter, to be put into a single fund and used to pay, in the *Ward case,* the certificates, and, in the *Maffit case,* the contracting water supply company, but in both cases such fund only could be called upon to pay for the new facilities. In the *Maffit case* it was said: "If in any given year the company should fail to realize as its share of the water rates the minimum prescribed by the contract no liability on the part of the city to pay the deficit would arise. The city might choose to pay the deficit, but if it refused to do so no suit to recover it could be maintained by the company." In the *Ward case* the statute under which the waterworks extension was to be effected, permitted the use of the income of the present, as well as the new, plant. The rule announced in those cases is applicable here to the question as to what shall be considered as creating a debt against the city. To constitute a debt against the city there must be an obligation which the city must, if need be, meet with its funds or property. Counsel for appellants argue that the situation created by this ordinance is a subterfuge; that the city intends to use the facilities in the completion of this system and intends to use the income therefrom. Regardless of what its intention might be, unless it is required by the ordinance to use the present owned facilities or income therefrom, and is compelled to mortgage such facilities and their income to pay the certificates, so that the holder of a certificate may have recourse to such property or income, there can be no evasion of the constitutional limitation for the reason that there can be no debt. Counsel for appellants cite the following cases in support of their contention on

this point: *Leonard* v. *City of Metropolis,* 278 Ill. 287; *Schnell* v. *City of Rock Island,* 232 id. 89; *Lobdell* v. *City of Chicago,* 227 id. 218; and *Village of East Moline* v. *Pope, supra.*

In the *Leonard case* the city proposed to mortgage its present owned plant, and income therefrom, and the case came clearly within the rule announced in *City of Joliet* v. *Alexander, supra.* In the *Schnell case* the city was already indebted to an amount over its constitutional limitation and issued $40,000 in certificates for the purpose of extending its waterworks system. The certificates were to be "payable out of the water fund and the special taxes which might be annually levied." Thus not only was all income from the entire waterworks system pledged, but tax secured funds as well. In the *Lobdell case* the certificates for the purpose of extending a railway system expressly recited that they were secured by a mortgage or a trust deed "covering the whole of the street railways owned by the city of Chicago or hereafter acquired by said city, and all of its stations, cars, equipment, rights, franchises and property of all kinds, real and personal, obtained or held for use in connection with its said street railways, whether now owned or hereafter acquired, so far as such street railways and other property are acquired or shall be acquired through the use of said street railway certificates." They provided further that whenever default should be made on such certificates, as therein provided, the whole of such certificates outstanding might be declared to be due. The mortgage conveyed the entire system so far as such street railways were acquired through the issuance of street railway certificates. It was there held that the city, in issuing the street railway certificates and executing the trust deed or mortgage to secure the payment thereof, was doing more than giving to the holders of the certificates a purchase money mortgage on the property acquired with funds derived from the sale of the certificates; that such certificate

holders were given a right, on purchase at foreclosure sale, to operate the street railways for a period of twenty years, which would not only entail loss to the city of the control of its streets for railway purposes for twenty years, but would deprive it of many hundreds of thousands of dollars which was shown in that case to be paid as compensation for the use of the streets. It was held that a debt was thus established beyond the constitutional limit. In the *Village of East Moline case* the city was indebted to its limit and in order to purchase a waterworks system it issued $35,000 in bonds, payable out of the income of the waterworks system to be constructed, and out of a fund to be raised by taxation. This was held to constitute an indebtedness. It was said in that case, however, that it was manifest that if nothing but the income from the waterworks system was to be pledged or could be reached, no debt would be created.

These cases differ from the one before us in that there is here no pledge of any property or income, other than the system and its income, to be acquired by sale of the certificates. Whether the city shall choose to later contribute to the payment of such certificates from income arising from the present owned facilities, is not a matter material here. No such income is pledged and the question whether, had it been pledged, such pledge would establish a debt, is not here.

But counsel for appellants say the switching station proposed to be constructed as a part of the new system is to be located on present owned property near the city hall, and that notwithstanding the ordinance declares that such property shall not be pledged under the mortgage, yet when the structure, which the specifications show is to be erected on a concrete foundation fixed in the soil, is so erected, such structure will become a part of the real estate and a mortgage of the structure is a mortgage of the real estate, and, this being so, the city is mortgaging present owned property for the construction of this system. Both the ordinance

and the certificates issued thereunder provide that present owned real estate shall not be mortgaged. When these certificates are accepted, they, together with the ordinance and such acceptance, constitute an agreement that the switching station when erected shall be treated as personalty and not realty. This may legally be done.

In *Sword* v. *Low,* 122 Ill. 487, this court, quoting from *Smith* v. *Benson,* 1 Hill. 176, states: " '*Prima facie,* such buildings [when erected on real estate] would be a fixture, and would not be removable; * * * but the parties concerned may control the legal effect of any tranaction between them, by an express agreement.' See also *Shuart* v. *Taylor,* 7 How. Pr. 251; *Parker* v. *Redfield,* 10 Conn. 490; *Curtis* v. *Hoyt,* 19 id. 154; *Tibbetts* v. *Moore,* 23 Cal. 208." This court, in that opinion, also cites *Piper* v. *Martin,* 8 Pa. 206, where the sheriff had levied on two stills erected in the usual way in a distillery, and that court held that the agreement of the parties that these stills should be treated as personalty was conclusive. The Pennsylvania court there said: "Now whether, in contemplation of law, it was attached to the realty, or not, as a fixture, is immaterial, as the parties agreed to consider it personal property." Other cases to like effect are there cited. So in this case, where the city, by its ordinance and certificates, elects to treat a structure erected on present owned real estate as personalty, and such election is adopted and accepted by the holders of certificates, as they will be by accepting the certificates, such constitutes an agreement between the parties that the switching station shall be considered personalty, and a mortgage of such structure does not result, as between such parties, in a mortgage of the real estate.

Counsel for appellants also argue that the ordinance does not sufficiently provide for the acquisition of necessary real estate and rights-of-way. Section 3 of the ordinance provides that wherever it is necessary to construct the distribution system over and across private property

there shall be acquired by the city the necessary easements or rights-of-way in the manner provided by law. It is also provided, in section 20 of the ordinance, that the city council shall, as soon as practicable, after taking effect of the ordinance, "take such steps as may be necessary and appropriate for the accomplishment of the purposes of this ordinance." This is an authorization sufficiently broad to secure necessary real estate and rights-of-way.

It is also objected that the ordinance is invalid in that it does not provide that the contracts for construction shall be made at public letting. Section 20 of the ordinance does, however, provide that the contract shall be let in such lawful manner as the city council deems best. Paragraph 377 of chapter 24 of the statutes, (State Bar Stat. 1935, p. 427,) requires that a city shall, in all cases of contracts pertaining to public improvement which involve an outlay of as much as $500, let the contract to "the party submitting the lowest secure bid." It cannot be presumed on this hearing that officers will refuse to discharge this duty.

Appellants also contend that the court erred in excluding certain expert testimony offered on their behalf, concerning the plans and specifications offered in evidence. They say that these plans and specifications were such as to require the assistance of such expert testimony if they be readily understood. They argue that the court could not have the skill and capacity required to draw proper inferences and to form a proper judgment concerning such plans and specifications. Upon objection by the city such evidence was excluded. Appellants' counsel say that numerous elements entering into the description of materials to be used in the construction of buildings are left in doubt, and that many matters essential to the efficiency, utility and cost of the motors are not shown. It is claimed that these omitted matters were essential to a proper description identifying this particular plant from other plants which might be built.

The record shows at the time the offer was made, its purpose, as stated by counsel for appellants, was to show that the plans and specifications do not describe the plant, equipment and property proposed to be acquired and constructed, and that the ordinance, plans and specifications were not sufficiently specific to furnish a basis for bidding. Appellee's counsel argue that the only purpose of such testimony, if admitted, would be to draw the conclusions which the appellants' counsel are asking the court to draw, and thus they would be testifying only to ultimate facts. Such appears to be the effect of the offer. A witness may not be called upon to testify to ultimate conclusions which must be drawn by a court or a jury in determining the case. (*Coleman* v. *Marshall,* 263 Ill. 330; *City of Kankakee* v. *Illinois Central Railroad Co.* 258 id. 368.) Other purposes of such offer are argued by counsel for appellants in their brief, but in passing upon the propriety of the court's refusal to receive such testimony, we may look only at the purposes of the offer as stated on the record. It is clear to us, from an examination of the specifications and the plans, that expert testimony is not essential to a complete understanding of their meaning. Whether the ordinance, plans and specifications are sufficient to furnish a basis for bidding, has been treated, in this opinion, under such objection. While it would not have been error to admit this testimony, we are not convinced that it was necessary, and the court did not err in refusing its admission for the purposes stated in the record. While some portions of the testimony offered would have been proper, other parts would not, and under the rule stated in *Donnan* v. *Donnan,* 256 Ill. 244, where a portion of testimony offered is inadmissible for the purpose stated, it is not error to reject the offer.

We have examined the able and extensive briefs submitted by counsel on both sides in this case, and while we would not be justified in extending this opinion to include

an analysis of all cases cited, they have been examined and we are of the opinion that so far as the appellants in causes No. 23868 and No. 23940, are concerned, the court did not err in dismissing their bill.

We come then to the appeal by the Illinois Power and Light Corporation, No. 23776. The original suit in this cause was, as we have seen, filed by William N. Hairgrove as a tax-payer on his own behalf and on behalf of all other tax-payers. His complaint, together with the amendment thereto, challenged the validity of the ordinance on the grounds which have been hereinbefore enumerated. We have also hereinbefore described the attempts on the part of this appellant to enter the case, raise new issues and bring in new parties. This appellant argues that it holds a franchise to carry on the business of supplying electric service in the city of Jacksonville and that it was engaged in that business. It charged that the city had entered into a contract with the Administrator of Public Works, H. L. Ickes, whereby a PWA loan and grant was to be made to the city, and that the city, in entering into such contract, had exceeded its powers; that the plan adopted and followed by the said Ickes, as Administrator of Public Works, was an illegal plan to fix rates of privately owned utilities, and that the act under which he was operating violated the Federal constitution. In the motion filed by the city to vacate the order allowing this appellant to become party plaintiff, it was represented that defendant had no objection to the appearance of any tax-payer in the capacity of a tax-payer, but did object to intervention by virtue of any rights claimed in any capacity except as tax-payer. Later the plaintiff Hairgrove filed a motion to vacate the order allowing this appellant to intervene.

It is argued that this appellant had a right, under the provisions of the present Civil Practice act, to join as co-plaintiff; that such joining was not to be considered as an intervention, and that this appellant was, therefore, not re-

quired to take the case as it found it, as in the case of an intervenor. It is conceded that it could, had it desired, have come into the suit as co-plaintiff by taking the case as it found it. But it is said that it had a right, as such party, to raise new issues and bring in new parties. The record shows that counsel for this appellant disclaimed any desire to join as party plaintiff unless leave be granted to add such additional allegations and make additional parties defendant.

It seems clear from the facts shown that what was sought by this appellant was intervention in the proceedings to which it was not an original party. Under such facts one seeking to intervene must secure permission so to do. Such intervention will be granted or denied, depending upon the circumstances surrounding each case and the rules applicable thereto. The authority of the court to permit a person not made a party to a suit to intervene, exists only when a full and complete determination cannot be had without such person being made a party. (*Bossert* v. *Drainage District,* 307 Ill. 425.) The right to intervene is not an absolute right and it has been held that where such intervention will result in the injection into a pending suit of issues which unduly complicate the case, intervention should be denied. (*Ragland* v. *Wisrock,* 61 Tex. 391; *Houston Real Estate Co.* v. *Hechler,* 44 Utah, 64, 130 Pac. 1159.) The rule pertaining to intervention also is, that the intervenor must take the suit as he finds it. He is bound by the record of the case at the time of his intervention. He may neither change the issues between the parties nor raise new ones. He may not insist upon a change in the form of procedure nor delay the trial. (*Wightman* v. *Evanston Yaryan Co.* 217 Ill. 371.) Under this rule the court did not err in denying this appellant's motion to intervene and become a party.

Counsel for this appellant say that under the Civil Practice act it is entitled to become a party plaintiff; that the right to become such a party carries with it all rights,

powers and privileges of any plaintiff and that appellant, therefore, had a right to set up additional causes of action and bring in new issues and new parties. It is not claimed that any section of the Civil Practice act purports to deal specifically with intervention, but counsel say that by section 23 of the act it had a right to become a party plaintiff and, under sections 26, 33, 44 and 46 of the act, it had a right, having become party plaintiff, to raise new issues and join new parties. It is not argued that the right to become a party co-plaintiff carries with it the right to intervene, for they say that they have not sought to intervene, but it is said that the right to raise new issues and bring in new parties accrues from the right to become party plaintiff. Section 23 of the Civil Practice act provides that "If anyone who is a necessary plaintiff declines to join, he may be made a defendant, the reason therefor being stated in the complaint." Under section 25, which deals with the joinder of parties after the inception of the suit, it is provided that: "Where a person not a party, has an interest or title which the judgment may affect, the court, on application, shall direct him to be made a party." That section of the Civil Practice act was construed in *Bernero* v. *Bernero,* 363 Ill. 328, as applying to cases where a complete determination of the controversy cannot be had without the presence of other parties, and it was held that where one not a party has an interest or title which the judgment may affect, the court, on application, shall make him a party. It is further there said, "but it says nothing about intervention, and, so far as we see, adds nothing to the existing law on that subject." The same may be said of other sections of the Civil Practice act cited. We are of the opinion they do not change the rule as to right to intervene. We are also of the opinion that this appellant sought not only to be made a party but to intervene in the cause. As we understand the record, this appellant was not denied the right to be made a party plaintiff and to adopt the pleadings of the

original plaintiff or to make such amendments thereto as would not create new issues or bring in new parties. This permission counsel for appellant declined to accept. It can not be doubted that this appellant had the right to file an original suit if it saw fit to do so. It, however, did not choose that method. We are of the opinion that the court did not err in refusing to permit it to intervene as a party plaintiff. Argument is indulged in the briefs on the question whether a State court may try issues involving the validity of a Federal statute, but as this appellant had no right to intervene, raise new issues and bring in new parties, it is not necessary to decide that question. The court did not err in denying this appellant's motions.

The decree of the circuit court of Morgan county in causes Nos. 23868 and 23940, and its orders in cause No. 23776, are affirmed. *Decree and orders affirmed.*

Mr. JUSTICE WILSON took no part in this decision.