BURGESS et al. v. COLBY et al.

No. 5885.   Decided September 3, 1937.   (71 P. [2d] 185.)

*Larson & Larson,* of Manti, for appellants.

*J. H. Erickson* and *Ferdinand Erickson,* both of Richfield, for respondents.

FOLLAND, Chief Justice.

This is a suit for cancellation of deed to real property and assignments of water stock executed by Joseph Colby to his wife Mary E. Colby, 9 days before his death, on grounds of mental incapacity of the grantor. Want of consideration is also alleged. Colby left surviving him his widow, 2 daughters, 2 sons, and 4 grand-daughters, children of a deceased daughter. He died September 25, 1933. The conveyances to his wife were of the farm consisting of 280 acres, water rights of water used on the farm, and certain city lots in Salina, Utah. In November, 1934, the widow, Mary E. Colby, conveyed the farm and water rights to her sons Roy Colby and Elmer Colby. Shortly thereafter this suit was filed attacking the conveyances from Colby to his wife. The case was tried to the court sitting with an advisory jury. The only issue submitted was respecting the mental capacity of Joseph Colby at the time of the signing of the deed and water stock assignments. The jury returned a verdict finding that "at the time Joseph Colby signed the deed in question on the 16th day of September, 1933, his mental faculties were so deficient and impaired that he did not have sufficient power to comprehend what he was doing, its nature, and its probable consequences and to act with discretion in relation thereto." The trial judge adopted the verdict and made findings of fact and conclusions of law in harmony therewith, and entered a decree setting aside and canceling the deed to the land and the assignments of the shares of water stock.

On this appeal the assigned errors raise questions with respect to: (1) The sufficiency of the complaint to withstand general demurrer; (2) sufficiency of the evidence to sustain the findings and decree.

The only allegation of incapacity of the grantor in the complaint is the following:

"That at the time that said deed was executed and for a long time prior thereto and subsequent, the said Joseph Colby, was, owing to disease of the head and body and old age, being then about 78 years of age, and of unsound mind to such an extent as to be wholly in-

capable of transacting business; and never knew to the day of his death that he had made such a deed, but always thought he still owned said lands and personal property and continued to be in control thereof until his death."

A general demurrer was filed and overruled. This is a direct allegation that "Joseph Colby was * * * of unsound mind to such an extent as to be wholly incapable of transacting business" at the time the conveyances were made. This is a sufficient allegation and is not vulnerable to attack by general demurrer. 9 C. J. 1237. So, also, the complaint was not defective in pleading the instruments sought to be canceled. It is not necessary to set them out in haec verba. The pleading of the conveyances, in their general effect, was sufficient. 9 C. J. 1239. This was done.

We believe the evidence is not sufficient to support the findings of fact and the decree. The test applicable has been stated in *O'Reilly* v. *McLean*, 84 Utah 551, 37 P. (2d) 770, 772, wherein the court quoting from *Hatch* v. *Hatch*, 46 Utah 218, 148 P. 433, adopts the test stated in *Teegarden* v. *Lewis*, 145 Ind. 98, 40 N. E. 1047, 44 N. E. 9, as follows:

"In ordinary contracts the test is, 'Were the mental faculties so deficient or impaired that there was not sufficient power to comprehend the subject of the contract, its nature and its probable consequences, and to act with discretion in relation thereto, or with relation to the ordinary affairs of life?'"

The conveyances were in the nature of a testamentary disposition of the property of the deceased, his age and the nature of his sickness being such that he stood in contemplation of death. A recent test as to testamentary capacity was stated in *Re Hanson's Estate*, 87 Utah 580, 52 P. (2d) 1103, 1116, as follows:

"The true test is as to whether the testatrix had 'sufficient mind and memory [at the time of making the will] to remember who were the natural objects of her bounty, recall to mind her property, and

dispose of it understandingly according to some plan formed in her mind.' "

This being a suit in equity, we are privileged, and it is our duty, to ourselves weigh the evidence and conclude what the findings should be with respect thereto. This, of course, we do only after giving due consideration and weight to the verdict of the jury and the findings of the trial court. A careful reading of the record leads to the conclusion that plaintiffs have failed to sustain the burden of proof, but that, on the other hand, the fair preponderance of the evidence sustains the view that Joseph Colby was mentally competent to dispose of his property at the time of making the conveyances in question measured by the tests above quoted.

Joseph Colby was 78 years of age at the time of his death. His wife was 76 years of age. They had lived together for many years in Salina, Sevier county, had reared 5 children to maturity, and on the death of a daughter had reared her 4 children. They had accumulated some little property, including stock in the local bank, 280 acres of farm land, water rights represented by shares of stock in a canal system, certain town lots on which was their home, together with some sheep, cattle, poultry, and such other property as farmers usually have. The 4 remaining children were of age as were also 3 of the 4 grandchildren whom they had reared. Colby had been a man of strength of body and vigor of mind, well able to take care of his own business affairs. There is no intimation of mental disease or of any weakening of the mental faculties prior to the time of last illness. Insanity, imbecility, and feeble-mindedness play no part whatever in the case. Neither is there any suggestion of mental peculiarities, vagaries of mind, or of psychological disturbances. Colby became sick and confined to his bed about 3 or 4 weeks before his death. We are left in the dark as to the precise nature of his illness. The record discloses that two different physicians attended him and

that one of them gave him a "hypo," but neither doctor was called to testify. Whatever the nature of his illness, he grew progressively worse and for the last day or two prior to his death was unconscious. Early in his sickness he was disturbed in mind about his property, and several times mentioned that he wanted it "fixed up proper." On September 7th he signed a document assigning to his wife the shares of bank stock held by him. That transaction is not questioned in this case. On September 16th H. B. Crandall, cashier of the local bank, was called by Mrs. Jensen, a daughter and one of plaintiffs, to prepare a deed. He came in the afternoon of that day, but finding it difficult to obtain from Colby correct descriptions of his lands, left the house and obtained such descriptions from other sources. Crandall returned in the evening with a warranty deed containing the descriptions of the lands owned by Colby, made out in typewriting and ready for execution. The deed was signed by Colby, witnessed by Alvin Sorenson and Roy Colby, acknowledged by H. B. Crandall. The assignments of the water stock were signed at the same time. Some of the pertinent testimony of the defendants' witnesses follows:

Mrs. Lillian Colby Jensen, a daughter and one of the plaintiffs, testified that about the 5th of September Dr. West came and gave Colby a "hypo," and that from then on he "got worse until he died. * * * He didn't seem to realize much after that. * * * He would want to set up and he would want to lay down. * * * He would mumble. * * * It seems like he couldn't talk." Coming to the day when the deed was signed, she said he was "awful bad that day. * * * And after I says to father, I says, 'Father, here's Mr. Crandall, do you think you could talk to him?' And he didn't seem to know Mr. Crandall and Mr. Crandall says, 'Ill go on the other side of the bed.' And he went over on the east side of the bed and he began to try to talk to dad and mother came in then and spoke to Mr. Crandall, and we couldn't rouse father at all and he says, 'Well, I will sit him up.' But he didn't seem like he could raise him up so Mr. Cran-

dall says, 'Mrs. Colby, I can't do anything. It won't be legal.' And mother spoke up and says, 'Can't you do something, the court will get it all.' And he worked a few minutes and he says, 'I'll go down and see Mr. Anderson and see if he knows anything about his land and water.' "

Mrs. Jensen left the Colby home, but returned later in the evening when the deeds were signed. She then said of her father's condition: "Dad was just as bad then as he was when I left."

She was asked if she had talked to either of her brothers about the conveyance to them by their mother of the farm property, and she answered: "No, I haven't talk to them about the land or anything like that because I have never got a chance.

"Q. Have you ever asked for a sort of an understanding or settlement or anything? A. Only through what mother has told me.

"Q. I mean just talked direct to the boys? A. No, I haven't."

Mrs. Jensen testified that she assisted her father in making the assignments of the water stock, and also that she went to Mr. Crandall and asked him to come for the purpose of preparing the deed. On cross-examination she was quizzed about this as follows:

"Q. You were party to that and now you come into court and complain about it. Do I understand you, Mrs. Jensen? A. It was all right if Mother had got it, but she conveyed it to somebody else.

"Q. Sure that was fine as long as your mother had it, you had no objection and do not have now? A. I don't know why I shouldn't.

"Q. Answer that, isn't that a fact, if that hadn't been conveyed by your mother, you would not have been in this court complaining now? A. If mother had taken care of it and kept it in her own name and used it so, as she used—kept it so she wouldn't have to go without things, I never would complain, no sir."

Mrs. Emily Colby Burgess, a daughter and one of plaintiffs testified that father "was flighty and restless, wanted his property fixed up right. He was raving all the time about it. * * * He would rave a while then he would drop

off to sleep. * * * He would wake—when he would kind of wake up, he would be raving about fixing up his property and doing things right." On cross-examination she testified:

"Q. You say he raved, about it, what do you mean by that?   A. Well, he was flighty, seemed to be delirious.
"Q. What did he say?   What did his ravings consist of?   A. He said he wanted somebody to come and help him fix his property up.
"Q. That sounded sensible, didn't it?   A. I would—
"Q. Did that sound sensible to you?   A. Yes sir."

This witness was not present when the deed was signed, but she knew of it later.   She was asked:

"Q. When you heard about it, you thought that it is all right, didn't you?   A. No, I didn't.
"Q. Why not?   Why not?   A. Because I knew what mother would do with it.   I knew she would sign it over to the boys if she got it in her name.
"Q. That is what you are complaining about here?   A. Yes sir."

Mrs. Cleo Crane Keisel, a granddaughter and one of the plaintiffs, testified as follows:

"A. Well, grandpa, some days when I went in, some days he would feel like—you'd think he was going to talk to you—his mind was quite bad on his farm and what was taking place.   He would repeat over, and over, and over, and over and over one certain phrase.   He would say—he would keep it up, and keep it up all the time I was in the room, he would never change, if he could talk; and other times he would mumble and lay there.   He was just so nervous and flighty and so depressed.   Nothing was done exactly what he wanted done. We done everything we could for him, but he got weaker every day."

Mrs. Keisel was present when the deed was signed.   She testified that Mr. Crandall, her uncle Roy, Alvin Sorenson, and her grandmother were also present; that her grandfather sat on the side of the bed and they put a stand in front of him on which he signed the papers; that Crandall

"had been up there once and seen pretty well that grandpa didn't know him, and he says, 'I can't do anything, Mrs. Colby, it won't be

legal! He went back and it wasn't one hour while he was gone and he come back with these deeds. They held grandpa up and Uncle Roy sat on the bed and he had to hold his pen and he was writing these deeds and Mr. Crandall says, 'Roy, you will have to press harder! They couldn't see the imprint on the deeds at all. So Uncle Roy helped him writing. * * * He was so sick, he didn't know what he was doing and after the deeds were signed we all set down and Mr. Crandall—grandmother asked how about the horses and Mr. Crandall says, I don't know anything about the stock out on the farm or anything like that. * * * He says 'I will have to make out a bill of sale for the cattle and what is out on the farm.' And grandmother says, 'how about the horses.' He says, 'is there any implements out there, Mrs. Colby,' and she says, 'I don't care about the implements.' She wasn't interested in them, but she wanted the cattle and horses and stock out on the farm. We went in the front room. Before we did, grandmother says to Mr. Crandall, 'How about making out these three 40s to Roy?' This is a certain tract of land that grandpa had executed to Roy at one time. He hadn't paid for it the way he understood it but grandpa took it back. And he says, 'Mrs. Colby, I simply couldn't do anything like that. It wouldn't be legal.' He says, 'This is all I can do.' * * *

"Q. Well now, Mrs. Keisel, from your observation of your grandfather during his last illness and particularly before he made this deed and on the day that this deed was executed, I will ask you whether or not in your opinion that you think that your grandfather had sufficient capacity and that he understood the nature of the transactions? A. No, I know he didn't. Because if he had it would never been fixed that way. Grandpa fixed it more solid so grandma only keep it in her name till she was through there. Grandma said, herself, 'If I ever have the property in my name, as long as I live, it will be mine, nobody elses.' And I know grandpa wasn't capable because at the time if he had of been, when grandma asked Mr. Crandall if he would sign those three 40s over to Roy, grandpa'd said something, something whether he did or whether he didn't, and he never said a word. I know he wouldn't have signed it if he did."

She further testified on cross-examination there were two or three papers and that Mr. Crandall read

"it there. * * *

"Q. He read the deed? A. He certainly did, he read it to grandpa.

"Q. And your grandfather said, Yes? A. No, he didn't say yes. he couldn't say yes.

"Q. What did he say? A. He just mumbled."

This witness was asked, "I take it from your testimony already given here that you have no objection to this property being in the name of your grandmother, and never did have any objection? A. I certainly did not."

Mrs. Nina Sorenson, a neighbor, who said she called frequently, testified as follows:

"Q. Will you state to the court and jury your observations of his physical and mental condition and as to how he acted and what he said at different times? A. Well, kind of hard to tell. Some days he was a little better than others. Some days he slept most all day, some days he rambled and was delirious and for a while he was quite delirious when he wasn't asleep. He rambled and talked. But if you talked you could get a direct conversation out of him on whatever subject you talked.

"Q. Well, did you hear him say anything you recall at different times? A. Well, maybe I don't quite understand your question, in what line?

"Q. Did he talk anything about his effects or property or what did he say if you recall anything? A. Oh, I don't think he talked much of anything in particular to me anything. Once in a while he would talk on property and once in a while he would talk on different trips he had been on lately, just varies with different subjects that come to his mind.

'Q. Did you ever hear him say anything about giving his property or conveying his property? A. Oh, along in the last few days, yes. He would give it to anyone in the last few days.

"Q. Just state what he said, if you recall. A. Grandpa was quite a business man. He very often talked on business when he was well, let alone when he was sick. It was something on his mind and printed deep. His talk varied on different things about what he had and what he wanted to do with it, like that, and sometimes I don't know as he realized, other times he may have done, depend on how his fever ranged.

"Q. Well, did he say as to who he wanted to give his property to or convey it? A. He had before the deeds was signed. Before he got so very bad. He had very often said to me that he wished his property would stand until his death and that he didn't care, but after he got worse, I can't say that he had any personal opinion on anything."

On cross-examination the witness testified:

"Q. But from your observations there, Mrs. Sorenson, did I understand your testimony that at times he seemed to function in all respect, intelligently and reasonably like men usually do? A. Just subject to a conversation he would talk with you, he may understood."

H. F. Jensen, a son-in-law, sat up with Colby the night of the 15th of September. Of his condition then the witness said:

"The night of the 15th he was flighty and he wanted to give me his property time and time again, just kept repeating it over. He kept that up during the whole night until along toward morning. I wouldn't consent to take his property so he offered me $600. He says you have got to take that. I says, 'All right, I'll take the $600.' Thought maybe it would quiet him so he would lay down and rest. After I told him I would take $600 that seemed to relieve him. That was, maybe, breaking daylight. He laid down then.

"Q. Well, how was his physical condition, was he able to be out of bed? A. I should say not, he was confined to his bed. Every time he would have to be moved you would have to move him every time. Time or two I went there and shifted him. He was in bed those times. He was never up unless someone had to help him.

"Q. Then you were there on the 24th was that the time that he died? A. Yes sir. That was the night he died.

"Q. Well now, Mr. Jensen, from your observations as to what you saw, his physical condition, his illness and what he said and how he acted, I will ask you whether or not, in your opinion that he was legally capacitated to execute deeds conveying his property away to others along on the 16th of that month? A. No, I should say—I would say he wasn't, because the night of the 15th, the night he wanted to dispose of his property to me."

Bryant Burgess, a grandson, testified:

"Well, it seemed about the time that grand dad went to bed he was pretty sick man, although at that time you could talk to him and get a fairly good conversation out of him, but it seemed as the days went on, and it didn't seem very long at that, that he got so he didn't even know me when I went in. I never pried much into his business, but I would go in and watch him. Always liked grand dad, but I never said much to him.

"Q. I see, but he appeared to be a very sick man, you say? A. Yes sir."

With respect to the coming of Mr. Crandall, this witness testified as follows:

"I stepped behind the stove. Aunt Lil was there at the head of the bed on the east side, and when Mr. Crandall came in she said to grand dad, she says, 'Here's Mr. Crandall to see you.' And grand dad didn't seem to hear, didn't seem to me like he heard anything. Aunt Lil says, 'Shall I turn him around so you can talk to him?' and Mr. Crandall says, 'No, I'll walk on the other side of the bed the way he's facing and talk to him.' Mr. Crandall walked around and by that time grandmother came in and she stood at the foot of the bed. Mr. Crandall reached over and across the bed and shook hands with her. He says, 'I have come up to fix up Mr. Colby's property which you sent for me to come to do.' He began to ask grand dad ·questions about his land and ask him how many acres he had and the location of it and how many cattle he had, and all grand dad could do in answering him was sort of mumble and talked to him in a delirious way. Couldn't understand what he was saying and so grandmother spoke up then and says there was three 40s I would like to have you put into Roy's name, and Mr. Crandall says, 'I can't do that.' Mr. Crandall began after—tried to talk to grand dad, ask him how much land he had, its location and all grand dad could do was sort of mumble, talk out of his head, the way it sounded to me, couldn't understand what he was saying. Grandmother spoke up and says, 'You know how much land and cattle you got. Tell Mr. Crandall.' Grand dad sort of mumbled. You couldn't undertsand what he was saying. Then Mr. Crandall asked grand dad a couple more questions and he raised up and he says, 'Mrs. Colby, I can't do a thing.' He said, 'I can't fix out any deeds because,' he says, 'it wouldn't be legal.' And grandmother says, 'Mr. Crandall, can't you do something. If you don't it will go into the courts and be all et up.' Mr. Crandall says, 'Well—' He thought a moment, he says, 'I'll go down and see Mr. Oscar Anderson because he is the man that sold Mr. Colby the land and water and I'll come back and see you later.' "

## Claud Burgess, a son-in-law, testified:

"Well sir, Mr. Colby, when he first took sick, he was up and down first few days, up and down. Laying down and drowsy and then along about the first of September he went to bed somewheres along in there, not very far away from September 1st, he went to bed and he was bedfast and he kept getting worse, and sick. And there was no getting around it, he was about as sick a man without dying. He was an awful sick man. And he was delirious most of his time, delirious

and flighty, and he would start to talk on one subject and change the subject on something else, nothing concerning what he was talking about first.

"Q. You recall the time that they, that certain deeds being executed, signed, purported, claimed to have been signed by him? A. Along about the 16th of September.

"Q. Yes, You recall that day? A. I recall that day. I was up there that evening after the deeds was signed, told me the deeds had been signed. Grandmother told me the deeds had been signed. It was along about 8:00 o'clock and grand dad, he kind of raised up like he had been asleep and he hollered, 'Ma, ma, ma! about three times. He says, 'How's those deeds been fixed?' She come running in and she said 'Joe, you know how they were fixed.' He laid down and said, 'Oh dear' and dropped over and never said another word and he never said another word for hours afterwards.

"Q. Did you stay there that night? A. Yes sir, I did. I set up with him that night. I set up with him that night and during the night he kept hollering different times. He says 'They are taking my grain out of my granary.' He says, 'Go and see.' I would get up and go out and pacify the old gentleman and come back and he would say, 'Was they taking all my grain?' I says, 'Nothing bothering' and he would lay down and go to sleep. Along towards morning he woke up and says, 'I want you to be President of the United States and I will be President of Canada.' Just talking out of his head like that."

## On cross-examination he testified:

"Well, I'll tell you, there's one thing I omitted. I went up along the first of his sickness there. I had some little account with grand dad and I went up to fix it up with him, and he said, 'Don't bother me now.' He says, 'I'm too sick,' he says, 'I can't remember things,' he says, 'I can't remember things.' So we let it go. That was along about September 1st. I had some notes and things I wanted to fix up with grand dad. He says, 'I am too sick. I can't remember everything.' He says, 'Let's let it go till I get better' and he got so sick I never asked him any more about it. And he couldn't fix out nothing—"

We shall now review the testimony of witnesses for the defendants. P. H. Mattsson, a disinterested friend, visited Colby about 5 or 6 days before his death. He described his condition as follows:

"Well, I went to see Mr. Colby. The wife was up the day before and informed he was very sick and I went to the house and he was turned

towards the wall, facing the wall. One of his daughters said, 'Mr. Mattsson has come to see you father.' He turned right over towards me, reached his hand out and shook hands with me and recognized me. I talk with him for sometime. Of course, I realized the man was weak and I didn't go into real conversation in particular, but so far as I could see he was sensible and all right any more than he was a sick man.

"Q. Would you say that he was in his senses and rational, from the observation you made and from the opinion you formed? A. I would, and so far as I know what he was doing is concerned at that particular time. I think he would have been capable of doing things, to my best judgment."

### And on cross-examination testified:

"It seemed to me like it was Mrs. Jensen that come in and says, 'Father—grandpa—Mr. Mattsson is here to see you.' And he had his face turned towards the wall. He turned over, spoke to me and shook hands with me."

### Mrs. Malone Murphey, a friend of the family, testified:

"Q. At times you were there did you observe his physical and mental condition? A. Well, I don't know that I can say that. I called on him every day, but I never made no—I just go in the room and ask him how he was. That's all. That's all that was ever said.

"Q. And from your visits and your observations is it your opinion that he was rational and sensible during any and all the times you were present? A. Always with me.

"Q. Did he ever fail to recognize you on your visits? A. Well, the last three days before he died I never even spoke to him. I went to the door and looked at him and walked out. I never spoke. So he didn't. * * * Sometimes he would say, 'I feel better this morning.' And maybe again he would say, 'I don't feel so well.'

"Q. Did he ever say, 'I am a pretty sick man'? A. No sir, he never has to me."

### Alvin Sorenson, one of the witnesses to the deed, testified:

"Q. During any of the visits that you made there did he ever appear to be delirious or out of his mind or out of his head? A. He never was while I was there.

"Q. I think you are a witness to a certain deed that was executed on the 16th day of September, 1933? A. Yes sir.

"Q. That is true, is it? Is this your signature that appears on the deed, Mr. Sorenson? A. Yes sir.

"Q. And is that the signature of Mr. Colby? A. Yes sir. * * *

"Q. At the time you acknowledged the signature of Mr. Colby, I will ask you whether or not he appeared to be rational and sensible in all respects? A. Well, when I came in I shaked hands with him, asked him how he was and then Mr. Crandall was there and Mr. Crandall says to him, he said, 'Mr. Colby,' he said, 'How long have you done business with me?' and he said, 'Ever since you started the bank here.' 'Well,' he says, 'that's a long time.' Mr. Crandall he said, he said, 'You realize what you are signing, these papers for?' And he says, 'I do.' And then he put his feet out over the edge of the bed and they brought a little table in there and he signed it."

## On cross-examination:

"Q. Who held Mr. Colby's hand while he signed the name? A. Well, he didn't have anyone to hold his hand the first few papers, he signed it right up. I believe there was one or two papers at the last Roy Colby there held his arm. He was getting kind of weak and Roy kind of held him.

"Q. Kind of steered his hand? A. I don't know as he steered his hand. He held his arm.

"Q. Was he completely out of bed or sitting on the side of the bed? A. He was, like this chair was the bed, he had his feet out over the bed and the table here. * * *

"Q. While you were there you have no recollection they read anything? A. I don't remember whether they were read or not.

"Q. As a matter of fact they were just placed in his hand—A. I don't know if that certain paper—Mr. Crandall read some. I don't remember just the paper it was that he read.

"Q. You have no recollection of the particular instrument that he did read? How many calls did you make there during the last illness of Mr. Colby? A. I was only there once before and once after that."

## Clayton Rasmussen, a friend of the family, testified:

"Well, I called in to see Mr. Colby several times and he would call me by name, stick out his hand and want to pass the time of day with me.

"Q. According to the observations made by you, based upon your opinion formed at that time, was he at all times of a rational and sensible frame of mind? A. He would call me by name. I think he was. * * *

"Q. And at that time did he appear to be a rational man? A. He would sleep and when he would rally, he seemed to be rational. He would sleep quite a bit.

"Q. Did you ever note during your visits or during the night you stayed up with him he was delirious or irrational? A. No. When he would arouse he was rational as could be. He would ask for the bed pan and that was the end of it. He would go to sleep and so far as I am concerned and know he was rational.

"Q. You have no interest in the outcome of this controversy. A. I haven't.

"Q. And I take it you are not related to any of the parties in this action? A. I am not."

Leah Crane, a granddaughter and one of the defendants, 17 years of age and attending school, but whose interest, if any, so far as the record discloses, would be served by a decision for plaintiffs, testified that she lived in the home of her grandfather. She testified of his condition as follows:

"Q. Was he in your opinion and from the observation you made, rational and sensible? A. Yes sir.

"Q. And capable of knowing what he was doing? A. Yes.

"Q. Did you wait on him frequently? A. Yes sir.

"Q. And made observations of his condition day by day during his illness? A. Well, nearly every day I went in and talked to him, and by that I could tell what his condition was from my view.

"Q. Did he always recognize you and speak to you? A. He always called me by his name. Called me by my name and asked me about different things, what I was doing.

"Q. And carried on an intelligent conversation at all times? A. Yes sir."

On cross-examination:

"A. Well, when I would get up in the morning, I would always go in. I never failed to go in there. After I did my outdoor chores, I would always go in there. At noon I would usually go in there. At nights I would go in every night.

"Q. Just go to the door or inside the room and say hello and then go out? A. No sir. I would go in and sit on his bed and talk to him.

"Q. What did you talk about, your conversation? A. Mostly about the folks, about a cow he had gave me, about the calf, what I had been doing in school. We would talk different things about out on the farm. Different things that would come to our minds the first thing.

"Q. Did he continue to talk to you up to the day of his death in that fashion? A. His mouth was so sore he couldn't talk very plainly. About three days—I guess it was—about three days before, somewhere around in that date, I guess, he didn't hardly talk to anybody.

"Q. As a matter of fact it was about a week or ten days before he died this mouth condition developed? A. No sir, his mouth was sore for quite a while before he was dying. * * *

"Q. You ever remember of having been in the room when he was inclined to be a little delirious or a little out of his head? A. Only time they said he was delirious was when he would sleep, that I know of. I never heard him rave over anything."

## Walter Bird, an old friend of the family, testified:

"Well, the first time that I saw Mr. Colby I was down on the street in Salina and somebody said that he was sick in bed. And I thought, 'Well, if he is sick in bed, I'll go and see him.' I went up there and seen him. I stopped there probably 15 minutes and I talked to him and he seemed to be a worrying about his stuff out in the field. He said, 'Here I am sick and I ought to be out there taking care of my stuff.' I says, 'Well, don't worry about that. The boys will take care of your stuff.' I says, 'After a little you will be able to go out and take care of them yourself.' I talked with him a little while, then I went away. So I was gone probably a week. I couldn't tell you just the dates, but when I come back I went to see him and I walked in and I said, 'Good morning, Uncle Joe.' And shook hands with him. He said, 'Good morning.' I says, 'How you feeling today?' 'Well,' he said, 'not too good.' He says, 'I had a bad night last night.' 'Well then,' I says, 'Maybe you will feel better today.' I says, 'I am in a hurry and I am not going to stop and bother you much.' He says, 'Well, call again.' And I left. That is the only two visits I made to his place while he was sick. That's all I know about it.

"Q. He was in bed the last time you called was he? A. No, he wasn't as well as he was the first time I saw him.

"Q. Was he in bed? A. Yes, he was in bed both times, but he didn't appear to be as well the last time I saw him as he was the first time.

"Q. Was there anything in his speech or conversation that indicated to you that he was not possessed of all his faculties? A. No sir.

"Q. And would you say from your opinion and observation at the times you saw him that he was intelligent and conscientious and knew what he was doing and saying? A. Yes sir, I believe he was."

## Elmer Colby, a son and one of the defendants, testified:

"I was there every morning and night.

"Q. Did you note any delirious condition at the time of your visits? A. No.

"Q. On the contrary what did you observe? A. Well, he had a sore mouth and he would—when he would talk why it would be kind of hard to understand it.

"Q. Did he talk intelligently at all times or otherwise? A. Yes.

"Q. Which? A. Intelligently.

"Q. Intelligently or otherwise? A. Intelligently."

## And on cross-examination:

"Q. As a matter of fact he was a very sick man from September 25th until the date of his death? A. Yes he was sick or he wouldn't have died.

"Q. He appeared, when he would rouse from this sort of coma or deep sleep, he would appear rational to you did he? A. Yes sir.

"Q. But unable to talk? A. He could talk, yes. You get close to him and you could understand everything he said.

"Q. Would you have felt free to engage in business with him during this period of time? A. Why surely.

"Q. Buy and sell from him as you would the average individual? A. Yes sir.

"Q. You believe he possessed sufficient capacity to know the effect of any transaction? A. I think he did, yes. * * *

"Q. I presume your father was in a very weakened condition, that is, from about the 5th of September on, 15 to 20 days before his death? A. He was weak, of course. He was weak. He could raise up in bed and sit up on the side of his bed and he could talk to us.

"Q. You don't recall when he lost consciousness? A. No, unless he lost consciousness the last 24 hours."

## Roy Colby, a son and one of the defendants, testified:

"Q. Will you explain to the jury and the court the nature of his physical and mental infirmities as near as you recall them on the 16th day of September, 1933? A. Well, he was sick, had been for around a week or better, and—but he had always talked to us freely and more than his mouth was very sore and at times we had to spend a quite a lot of time in connecting his words so that we would understand him, and the folks there decided maybe we ought to have the papers kind of fixed up on account of him being so sick. So he asked

my sister to go down and have Crandall come up, sister Lil. She went down and found him and fetched him up or had him come up and he had to go back to get some deeds and fix those up and when they— he came back up why Mr. Crandall says we would have to have a witness. I went over to Sorenson's and got Alvin Sorenson and father set upon on the bed and fixed up—signed his name to the papers which was brought there to fix for him. Mr. Crandall, he talked to him and asked him if he knew what he wanted to do with the property and he told him he wanted to give it to mother, put it in her name. And Mr. Crandall, when he was signing the papers, he says, 'Mr. Colby, understand what you are doing in signing these papers?' He says, 'yes sir, I do.' And after the papers were all signed he says—father raised up and says, 'When I get well, I want all this property turned back to me.' And it was all sanctioned by the parties in the house, yes, we would.

"Q. In your opinion, Mr. Colby, did he seem to fully understand and appreciate at that time what he was doing? A. Yes sir, I believe he did."

And on cross-examination:

"Q. He could tell him the particular section, township and range that property was in? A. Could have done if his mouth hadn't been so sore.

"Q. He couldn't talk? A. Talked to him a little, had a time to do it.

"Q. And you are satisfied that had his mouth not been sore, he could have furnished the information wanted by Mr. Crandall, is that right? A. What was the question?

"Q. If his mouth hadn't been sore, he could have told Mr. Crandall what property he had? A. Certainly."

Mr. H. B. Crandall, cashier of the bank, testified he was acquainted quite intimately with Colby who had transacted business with his bank for many years. With respect to the preparing and execution of the deeds, his testimony follows:

"A. Well, I don't remember the date, but I was invited up there. Mrs. Jensen asked me to go up one night to see her father. He wanted me to make some papers.

"Q. What did she say to you when she invited you to go up? A. I don't remember the conversation, but just merely invited me up there, that they wanted to see me.

"Q. Just explain to the court and the jury, Mr. Crandall, what you did, what you observed when you did go up there? A. It was late in the afternoon, if I remember it and I had been away. They wanted me to go up there and make a deed to his wife for some property. There was the city lot in Salina, then there was some—he wanted me to make a deed for some property to his wife, a city lot in Salina, if I remember it and some farm property out north of Salina. I didn't know the description of that and they looked around and tried to find the papers, couldn't get the proper description that I could make the deed from, so we went to Oscar Anderson and he worked out the description of the property for it. The deed, as I remember it, was made.

"Q. Is this the deed, Mr. Crandall, that you made at that time? A. Yes sir.

"Q. Is that the signature of Joseph Colby which appears as the grantor? A. Yes sir.

"Q. Is this your signature on the reverse side? A. Yes. * * *

"Q. Mr. Crandall, did you, during the latter days of his life have any other occasion to discuss any matters with Joseph Colby? A. Well, I don't remember any specific case. He was just a citizen in town, lived within a few blocks of the bank. I don't recall any occasion.

"Q. Was he any different in your opinion and from the observations you have made or had occasion to make from his usual condition of mentality at the time when you went up to have this deed executed? A. I could see no difference. He was sick, of course. But so far as mental condition was concerned, I could see no difference.

"Q. He directed you, did he, to execute these deeds? A. Yes sir."

On cross-examination:

"Q. * * * Did he get up and sign it or how was that arranged? A. No, as I remember it he set up and I believe he put something, a book or something under the deed. It's just faint to my memory. I don't think that he got up to sign it, no.

"Q. Well, did someone kind of take hold of his arm or hand and— A. Not of his hand. That is his own writing. He could write, all right.

"Q. Didn't Roy sit by the side of him and kind of take hold of his arm or wrist and assist him? A. I don't remember it. As I remember it he signed his name alone.

"Q. You do? A. I—maybe I wouldn't state positively, no sir. I wouldn't state positively. It's been two and a half years ago and he may have assisted him. * * *

"Q. She came there. You went down there and did you remember whether there was something said about wanting him to deed 140

acres or something like that to Roy, Mrs. Colby told you?   A. I don't remember.

"Q. Wanted you to make it out and you answered, 'No, that wouldn't be legal' or something to that effect?   A. I don't remember the circumstances.

"Q. You don't recall anything of that kind?   A. Was it a deed from Mrs. Colby to Roy or Joseph Colby to Roy?

"Q. No make it direct from Joseph Colby to Roy.   A. They didn't. make anything like that.

"Q. I know, but was there something said about that?   A. I don't know.

"Q. There might have been something said about that, perhaps, that you wouldn't recall?   A. I don't recall anything like that.

"Q. But you wouldn't deny but what that may have been stated there?   A. I don't recall anything like that, no sir."

It is rather evident that the daughters were not at all disturbed about the conveyance of the land and water to their mother until after she conveyed some of the land to her sons. We are not informed with regard to the terms or conditions of that conveyance, whether for an adequate or any consideration, except the record discloses the deeds were still in the bank at the time of trial; that Elmer and Roy Colby were in possession of the farm; and that there was some writing made by them to their mother which was offered but not received in evidence. The city lots were not conveyed to the sons so far as we are informed, nor are we informed with regard to the bank stock. The sole question litigated was whether Joseph Colby was competent to convey real estate and water stock. There is no question of undue influence. It would seem the conveyance to his wife under the circumstances would be the most natural thing for him to do. The conveyances were not signed in secret, but openly and with full knowledge of all the family. Mrs. Jensen, one of the plaintiffs, aided the father in assigning the bank stock to her mother and was the messenger to invite Crandall to come to her father for the purpose of preparing and having executed the deed in question. She and her sister and their husbands knew all about the transaction at the

time. The evidence discloses they discussed it both before and after the making of the deeds, and that they fully knew that Colby wanted his property "fixed up" in anticipation of his death, and in order to avoid court costs and other expenses incident to the probation of the estate. It also appears that when the mother made some arrangement with her sons and executed a deed to the farm the plaintiffs then consulted a lawyer without first discussing the matter with the brothers and this suit resulted. It is significant that most of the disinterested witnesses, and also the granddaughter whose interest, if any, would be with plaintiffs, but who had refused to join them in the suit, all considered that Colby was fully competent mentally; that while he was a sick man and getting weaker day by day, and having difficulty of speech on account of having lost his teeth and some apparent soreness, yet, he was able to talk about the affairs of the day, of his travels, of the farm and its care, and to recognize his friends when they called. The witnesses for plaintiffs who say that he rambled in his talk or was delirious seemed to use this word in a rather inaccurate way. The rambling apparently was that the old man would change from one subject to another and even these witnesses give very little report of any actual delirium.

The judgment and decree of the trial court is reversed and set aside and the cause remanded to the district court of Sevier county with directions to make findings of fact and conclusions of law in harmony with the views herein expressed. Costs to appellants.

HANSON, WOLFE, and LARSON, JJ., concur.

MOFFAT, Justice.

I concur. I am of the opinion, however, that the cause should be remanded for a new trial.